COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



§

CHARLES GONZALEZ,                                         No. 08-04-00057-CR

§

        Appellant,                                    Appeal from

§

v.                                                          168th District Court

§

THE STATE OF TEXAS,                                     of El Paso County, Texas

§

        Appellee.                                     (TC # 20020D06358)

§

**O P I N I O N**

Charles Gonzalez appeals his conviction of capital murder. A jury found Appellant guilty, and the trial court assessed an automatic life sentence as the State did not seek the death penalty. In the initial appeal, we reversed the trial court's denial of a motion for change of venue and remanded for a new trial. *Gonzalez v. State*, 225 S.W.3d 102 (Tex.App.--El Paso 2005). However, the State's petition for discretionary review was granted and the Court of Criminal Appeals reversed our decision and remanded the case to us to address the remaining points of error. *Gonzalez v. State*, 222 S.W.3d 446 (Tex.Crim.App. 2007). We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In October of 2002, Appellant lived in the home of his friend, Joshua Moss, in Chaparral, New Mexico. One evening, Appellant and Moss smoked marijuana while watching movies and

playing video games. Another friend, A.C.,[1] joined them and brought approximately .3 grams of cocaine. After the trio smoked all of the cocaine, they purchased more and smoked it, too. Over the course of the evening, the group made several more trips to purchase additional cocaine, but eventually ran out of money. They were discussing ideas to get money when A.C. suggested they rob a Good Times Store in El Paso County. The others agreed, and they began to develop a plan. They decided that Moss would drive, and A.C. and Appellant would rob the store. Appellant said that they needed to take a weapon in order to scare the victim, and Moss specifically brought up the idea of using a gun. A.C. said that he had a gun at his house and told the others that if they take it, they "can't hesitate to use it." Moss knew that A.C.'s .22 rifle functioned properly because he had shot it before. Upon hearing this, Moss backed out because he was afraid A.C. would use the gun. Moss tried to convince the others that they should "rob a house" instead because there would not be any cameras and no possibility of anyone getting hurt, but they did not agree. Moss then tried to dissuade both A.C. and Appellant from committing the robbery, telling them that "no one gets away with it," but neither would listen to him. A.C. and Appellant left Moss's house at about 1:30 a.m. in A.C.'s car.

Charles Potts, a decorated Vietnam veteran, worked for the Good Times Store for four years and typically worked the "graveyard shift" from 10:30 p.m. to 6:15 a.m. During this shift, Potts worked alone in the store. The offense committed by Appellant and A.C. was recorded by the store's video surveillance cameras. That recording depicts Appellant and A.C., who was armed with a rifle, entering the store during the early morning hours of October 29, 2002. Their faces were partially covered by bandanas which Moss had given them. While pointing the rifle at Potts' chest, A.C.

---

[1] Because A.C. was a juvenile, we refer to him by initials only.

-2-

demanded that Potts give him the money and Appellant said, "everything." When Potts asked whether they wanted the ones too, Appellant again replied, "everything." After Appellant took the money from Potts, A.C. fired a single shot at Potts' chest, killing him.

Appellant and A.C. returned to Moss's house and Appellant told him that they had gotten the money. A.C., who was carrying his .22 rifle, then said, "I shot that fool." Appellant and A.C. split the $81 they got in the robbery. When Moss told A.C. he couldn't believe he had shot someone for $80, A.C. said that the man "got what he deserved." Both Moss and Appellant confronted A.C. about shooting the man. The trio used the robbery proceeds to purchase more cocaine.

The news media aired the video of the crime in an effort to identify and find the suspects. When Appellant's mother saw the video and recognized her son, she confronted him about it. Appellant turned pale and began sobbing. She told him to wait, and then immediately called the police to report that she had recognized her son in the video.

A grand jury indicted Appellant for capital murder. The trial court instructed the jury on the law of parties as it applies to a conspiracy, and it also instructed the jury on the lesser included offense of aggravated robbery. The jury found Appellant guilty of capital murder.

**LESSER-INCLUDED OFFENSES**

In Issue One, Appellant argues that the trial court erred when it refused to instruct the jury on the lesser-included offense of felony murder. He also argues in Issue Two that the trial court should have given an instruction on the lesser-included offense of manslaughter.

A two-pronged test is required to determine whether a jury charge on a lesser-included offense must be given. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App. 1993). First, the lesser-included offense must be included within the proof necessary to establish the offense charged.

-3-

*Id.* We must decide whether the lesser-included offense fits within the charged offense. *Mathis v. State*, 67 S.W.3d 918, 925 (Tex.Crim.App. 2002). Second, some evidence must exist in the record that if the accused is guilty, he is guilty only of the lesser offense. *Id.* In other words, there must be some evidence from which a jury could rationally acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Id.* The evidence must establish the lesser-included offense as a valid alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex.Crim.App. 2000).

A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX.PENAL CODE ANN. § 7.02(a)(2)(Vernon 2003). Under Section 7.02(b), a person is criminally responsible for an offense committed by another:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* at § 7.02(b). In determining whether an accused participated in an offense as a party, we may look to events occurring before, during, and after the commission of the offense and may rely on actions which show an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App. 1994).

A person commits capital murder if he commits murder as defined under Section 19.02(b)(1), and intentionally commits the murder in the course of committing or attempting to commit robbery. TEX.PENAL CODE ANN. § 19.03(a)(2)(Vernon Supp. 2008); *Fuentes v. State*, 991 S.W.2d 267, 272

-4-

(Tex.Crim.App. 1999). Felony murder is a lesser-included offense of capital murder. *Fuentes*, 991 S.W.2d at 272 (finding that in felony murder, the culpable mental state is supplied by the underlying felony). A person commits felony murder if, in the course of a felony commission, an unintentional murder is committed. *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex.Crim.App. 2004). Manslaughter is also a lesser-included offense of capital murder. *Mathis*, 67 S.W.3d at 925. A person commits manslaughter if he recklessly causes the death of an individual. TEX.PENAL CODE ANN. § 19.04 (Vernon 2003).

The distinguishing element between felony murder and capital murder is the intent to kill. *Fuentes*, 991 S.W.2d at 272. In deciding whether the accused is guilty of felony murder, what was anticipated before the offense is inconsequential. *Fuentes*, 991 S.W.2d at 273. The issue is whether there is any evidence that the accused did not intend to kill at the time of the shooting. *Id.* The "possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed." *Id.*, quoting *Rousseau*, 855 S.W.2d at 674 (holding that the appellant was not entitled to a charge on the lesser-included offense of felony murder when he ran up to the victim, shot him twice in the chest, and fled the scene). In *Mathis*, Appellant shot three people in the head, killing two and leaving one paralyzed from the neck down. *Mathis*, 67 S.W.3d at 921. Appellant testified that he acted recklessly with the gun and did not intend to kill anyone, but he admitted to aiming and firing it. *Id.* at 926. With four shots, Appellant killed two people and hit the third between her eyes. *Id.* (holding that the appellant was not entitled to a lesser-included instruction of manslaughter as his testimony did not supply evidence upon which a jury could rationally find his actions were merely reckless and were not at least knowing).

Appellant was criminally responsible for A.C.'s actions under Texas Penal Code Sections 7.02(a)(2) and 7.02(b). Appellant and A.C. agreed to rob the store and agreed that A.C. should carry a gun to scare the clerk. In the course of the robbery, A.C. shot and killed Charles Potts. The murder was committed in furtherance of an unlawful purpose and should have been anticipated as a result of carrying out the robbery. The agreements between the parties also showed an understanding and common design to commit robbery.

Factually similar to *Fuentes* and *Mathis*, A.C. intended to kill Charles Potts during the robbery. After A.C. shot Potts in the chest, he ran out of the store with Appellant. Appellant argues that the surveillance video should be interpreted to show that the gun went off accidentally as A.C. was preparing to leave. This argument fails for both lesser-included offenses. While the tape may show a possibility at some point during the robbery that A.C. did not intend to kill Potts, it does not amount to evidence that A.C. did not intend to cause his death at the time of the shooting. *Fuentes*, 991 S.W.2d at 272. The fact that A.C. shot Potts in the chest with a .22 and fled the scene with Appellant reinforces the notion that there was intent to kill. A.C. told Moss and Appellant that if they took the gun, they "can't hesitate to use it." Moss backed out of the initial plan because he was afraid the gun would be used. Thus, both A.C. and Appellant had knowledge that someone might be shot. Because there is not sufficient evidence from which a jury could rationally acquit Appellant of capital murder while convicting him of felony murder or manslaughter, the second prong of the *Rousseau* test fails. Therefore, the trial court correctly refused to instruct the jury on the lesser-included offenses of felony murder and manslaughter. Issues One and Two are overruled.

### CHANGE OF VENUE

In Issue Four, Appellant contends the trial court erred by refusing to allow him to present

additional evidence on the change of venue issue.[2] During voir dire, Appellant re-urged his motion for change of venue based on the venire members' response during voir dire and he attempted to present additional evidence regarding his request for a change of venue. The evidence consisted of testimony presented by A.C. during his successful change of venue hearing and business records showing how many articles had been published in the El Paso Times about Potts, Gonzalez, or A.C. from October 29, 2002 through December 1, 2003. The business records included sixteen complete articles about the crime. Additionally, Appellant offered evidence that 190 stories aired about the capital murder in the El Paso market between November 1, 2002 and August 31, 2003.

In analyzing the pervasiveness of the publicity, the Court of Criminal Appeals observed that there are two means of discerning whether publicity is pervasive: (1) a hearing on the motion to change venue, and (2) the voir dire process. In this case, the trial court used both. *Gonzalez*, 222 S.W.3d at 449. The court concluded that Appellant failed to present any evidence at the hearing of how many times the video was shown or how many people actually saw the broadcast. *Id.* at 450. Appellant offered this evidence during voir dire but the trial court sustained the State's objection based on surprise and did not consider it. It is the exclusion of this evidence that is the subject of Issue Four. Even if the trial court erred by sustaining the State's objection, it would not constitute reversible error because the Court of Criminal Appeals also found that the trial court acted within its discretion in concluding, based on the voir dire process, that the publicity about the case was not pervasive. *Id.* A lack of pervasiveness alone is sufficient to sustain the trial court's ruling. *Id.* Further, the Court of Criminal Appeals found that the trial court did not abuse its discretion by

_____

[2] In our prior opinion, we addressed only Issue Three which pertained to the trial court's denial of Appellant's motion for change of venue. Likewise, the Court of Criminal Appeals' opinion pertained only to Issue Three. We conclude that Issue Four must be addressed on remand.

concluding that the pretrial publicity was not prejudicial or inflammatory. *Id.* at 451. Thus, the trial court's refusal to consider the evidence offered during voir dire, even if erroneous, would not alter the analysis of the trial court's decision to deny a change of venue. Issue Four is overruled.

**EXCLUSION OF EVIDENCE**

In Issue Five, Appellant complains that the trial court abused its discretion by excluding evidence that the co-actor, A.C., stated that the shooting was an accident. He argues that the statement is admissible under Texas Rules of Evidence 803(24).

*Standard of Review*

We review the trial court's decision to admit or exclude a statement under Texas Rule of Evidence 803(24) under an abuse of discretion standard. *See Dewberry v. State*, 4 S.W.3d 735, 751 (Tex.Crim.App. 1999). We will not disturb the trial court's judgment unless it falls outside the zone of reasonable disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990).

A statement against interest is a statement that tends to subject the declarant to criminal liability. TEX.R.EVID. 803(24). A reasonable person in the declarant's position would not have made the statement unless he believed it to be true. *Id.* To be admissible, the statement must subject the declarant to criminal liability and corroborating circumstances must indicate the trustworthiness of the statement. *Dewberry*, 4 S.W.3d at 751. In deciding whether the corroboration is sufficiently convincing to clearly indicate the trustworthiness of a statement, a number of factors should be considered: (1) whether guilt of the declarant is inconsistent with guilt of the accused; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement is made; and (6) the existence of independent corroborative facts.

*Davis v. State*, 872 S.W.2d 743, 748-49 (Tex.Crim.App. 1994). The burden of producing corroborative evidence to prove the trustworthiness of the statement falls on the party seeking admission. *Cofield v. State*, 891 S.W.2d 952, 955 (Tex.Crim.App. 1994).

In *Dewberry*, two brothers shot and killed a homeowner. *Dewberry*, 4 S.W.3d at 741. Witnesses testified that one of the brothers confessed that someone had been killed and described how the murder was committed. *Id.* at 749-50 (holding that the statements were sufficiently self-inculpatory because they implicated him in the murder). Evidence showed that the statements were trustworthy. *Id.* at 750. The declarant's guilt was not inconsistent with the accused's guilt because both acted in concert throughout the offense. *Id.* at 751. The brothers were seen together before and after the murder, demonstrating that declarant was situated so that he could have committed the offense. *Id.* Declarant made incriminating statements before he or his brother became suspects in the murder, and a majority of his statements were made either spontaneously or in response to inquiries from friends not connected to the offense. *Id.* at 751-52. Police officers testified that the victim was tied up before he was shot, a pillow had been placed over his head, and he had been fatally shot with a shotgun. *Id.* at 752. The Court of Criminal Appeals held that these independent corroborative facts verified the declarant's statements and indicated their trustworthiness. *Id.*

Similarly, A.C.'s alleged statement that the shooting was an accident was sufficiently self-inculpatory and subjected A.C. to criminal liability. However, corroborating circumstances did not show that this statement was trustworthy. Although A.C.'s guilt as the co-conspirator and shooter was consistent with Appellant's guilt and the surveillance video showed that A.C. was so situated that he might have committed the robbery, the alleged statement was offered by the declarant during Appellant's trial. After the shooting, A.C. boasted to Joshua Moss that he "shot that fool" and that

Potts got what he deserved. Potts had previously identified A.C. out of a police lineup after he was arrested for an earlier robbery of the store. Joseph Diaz testified that A.C. held a grudge against Potts. In addition, Moss stated that the rifle used the night of the robbery appeared to be in working condition. Even if A.C. told Moss that the shooting was accidental, it could have been in response to criticism received from Moss and Appellant.

Appellant argues that the video footage of the incident provides sufficient corroboration to justify the admission of A.C.'s alleged statement. Appellant contends that the video showed that the clerk was cooperative during the robbery, the gun did not go off until Appellant was headed for the door, and it appeared the discharge of the gun may have been accidental. In support of his argument, Appellant cites *Wrighter v. State*, No. 08-99-00109-CR, 2003 WL 318527 (Tex.App.--El Paso Feb. 13, 2003, pet. ref'd)(not designated for publication). *Wrighter* is distinguishable. There, we affirmed a trial court decision that the defendant's statements were trustworthy and admissible because they were consistent with testimony from seven separate witnesses. *Wrighter v. State*, 2003 WL 318527 at *4. However, Joshua Moss testified that A.C. boasted to him that he "shot that fool" and that Potts got what he deserved. Furthermore, Joseph Diaz, a witness for the defense, testified that A.C. held a grudge against Potts. This testimony directly contradicts the theory that the shooting was an accident. While the surveillance video may be evidence that justified admission of A.C.'s alleged statement, the timing of the statement combined with contradictory testimony of two witnesses was not sufficiently convincing to clearly indicate its trustworthiness. Therefore, the alleged statement was inadmissible due to lack of corroborating circumstances and the trial court did not abuse its discretion by excluding it. Issue Five is overruled.

**VOIR DIRE**

In Issues Six and Seven, Appellant contends that the trial court erred by restricting voir dire. In Issue Six, he asserts that the trial court erroneously prohibited defense counsel from informing the jury that there had to be a specific intent to kill in order for a person to be convicted of capital murder. In Issue Seven, he maintains that the trial court prohibited defense counsel from explaining the law applicable to murder and manslaughter.

*Standard of Review*

The trial court has broad discretion over the jury-selection process. *Sells v. State*, 121 S.W.3d 748, 755 (Tex.Crim.App. 2003). Without the trial court's power to impose reasonable limits, voir dire could go on indefinitely. *Id.* We leave to the trial court's discretion the propriety of a particular question and will not disturb its decision absent an abuse of discretion. *Id.* A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id.* at 755-56.

*Texas Penal Code § 7.02(b)*
*and Specific Intent to Kill*

A right to question jurors during voir dire is included in the right to counsel guaranteed by Article I, § 10 of the Texas Constitution. *Gonzales v. State*, 994 S.W.2d 170, 171 (Tex.Crim.App. 1999). However, if a venirepanel is examined in accordance with the law of the parties, a trial court does not err in restricting the accused from examining the voir dire panel on the issue of a specific intent to kill. *Perea Velasco v. State*, No. 01-96-01075-CR, 1999 WL 12792, *3-4 (Tex.App.-- Houston [1st Dist.] Jan. 14, 1999, pet. ref'd)(not designated for publication). The law of parties, as set out in Texas Penal Code §7.02(b), may be applied in a capital murder case. *See Montoya v. State*,

810 S.W.2d 160, 165 (Tex.Crim.App. 1989). If, in an attempt to carry out a conspiracy to commit one felony, another is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, regardless of the intent. *See* TEX.PENAL CODE ANN. § 7.02(b). The law of parties applies only if the offense was committed in furtherance of the unlawful purpose and should have been anticipated as a result of carrying out the conspiracy. *See id.* Section 7.02(b) allows criminal responsibility for the conduct of another, eliminating the necessity for proof of intent to commit the felony actually committed, but it does not excuse the State from proving a culpable mental state. *Gravis v. State*, 982 S.W.2d 933, 938 (Tex.App.--Austin 1998, pet. ref'd). The State is required to show that the accused had both the mens rea to engage in the conspiracy and the culpable mental state to commit the underlying, i.e., the intended, felony. *Id.* The mental state for the underlying felony supplies the mens rea for the felony actually committed by the co-conspirator. *Id.*

In *Perea Velasco*, a capital murder case, the trial court denied the accused's request to argue during voir dire that a specific intent to kill was required to convict. *Perea Velasco*, 1999 WL 12792 at *3. The Court of Appeals affirmed the trial court's refusal because the State had examined the venire panel on the law of the parties. *Id.* Similarly, Appellant requested that the trial court allow him to explain to the jury that the State was required to prove a specific intent to kill. This request came after the State told the jury that no specific intent to kill was required under Section 7.02(b). However, because the statute only required the State to prove the intent to commit the underlying felony of aggravated robbery and not the specific intent to kill, the trial court did not err by denying Appellant's request to voir dire the jury on the issue of a specific intent to kill. *See Perea Velasco*, 1999 WL 12792 at *3. Issue Six is therefore overruled.

*Murder and Manslaughter*

To preserve error, the accused must show that he was prevented from asking particular and proper questions. *Sells v. State*, 121 S.W.3d 748, 756 (Tex.Crim.App. 2003). To show that the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not sufficient. *Id.* The court might have allowed the proper question had it been submitted for consideration. *Id.*

In *Sells*, the trial court refused to allow the defendant to question the venire panel concerning parole law. *Sells*, 121 S.W.3d at 755-56. The Court of Criminal Appeals characterized the defendant's questions as attempts to commit jurors to giving mitigating or aggravating effects to the minimum parole eligibility requirement. *Id.* at 756 (reasoning that the questions were ambiguous or irrelevant to a juror's duties). Like *Sells*, the trial court below denied Appellant's request to voir dire the jury on the law applicable to murder and manslaughter. Appellant argues that the trial court erred by preventing him from examining the jurors on the general area of inquiries of murder and manslaughter. However, Appellant failed to cite a particular, proper question that he would have posed to the venire panel that he was prevented from asking. *Sells*, 121 S.W.3d at 756-57. Appellant did not preserve this issue for review and the trial court did not err in denying his request. We overrule Issue Seven.

## PHOTOGRAPH OF DECEDENT

In his eighth issue, Appellant urges that the trial court abused its discretion by admitting a photograph of the decedent in his military uniform because the probative value of the photograph was substantially outweighed by the danger of unfair prejudice.

*Standard of Review*

The admissibility of a photograph is within the sound discretion of the trial judge. *Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App. 1997). We review the trial court's decision on photograph admission under an abuse of discretion standard and may reverse it only when the decision falls outside the zone of reasonable disagreement. *Jones v. State*, 982 S.W.2d 386, 394 (Tex.Crim.App. 1998), *cert. denied*, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999).

*Texas Rule of Evidence 403*

When the accused objects that photographic evidence is more prejudicial than probative, the trial court must conduct a balancing test under Texas Rule of Evidence 403. *Jones*, 982 S.W.2d at 394. Under Rule 403, the trial court determines whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. TEX.R.EVID. 403; *Reese v. State*, 33 S.W.3d 238, 240 (Tex.Crim.App. 2000). Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Reese*, 33 S.W.3d at 240, *citing Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim.App. 1990)(op. on reh'g). When conducting a Rule 403 balancing test, the trial court should analyze: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time the proponent will need to develop the evidence; and (4) the proponent's need for the evidence, i.e., whether other evidence is available and whether the fact of consequence is related to a disputed issue. *Montgomery*, 810 S.W.2d at 389-90. When analyzing photographic evidence, the trial court should also consider the number and the size of the photographs, whether they are in color or black and white, the detail shown in the photographs, whether the photographs are gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might

enhance the gruesomeness of the photographs to the accused's detriment. *Reese*, 33 S.W.3d at 241.

In *Burns v. State*, the defendant argued that a photograph of the murder victim in church was inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice. *Burns v. State*, No. 06-00-00248-CR, 2001 WL 958118, *3 (Tex.App.--Texarkana Aug. 24, 2001, pet. ref'd)(not designated for publication). Using the Rule 403 balancing test, the court of appeals held that the trial court did not abuse its discretion in admitting the photograph because: (1) the photograph was probative on the issue of the victim's identity, which the State had the burden to establish; (2) the photograph had limited potential to irrationally impress the jury because the victim was alive and fully clothed; (3) the State did not spend a great deal of time introducing and discussing the photograph; and (4) the only other photographs available were those from the crime scene and autopsy, which would have been more prejudicial than the photograph at issue. *Burns*, 2001 WL 958118 at *3. And the Fort Worth Court of Appeals found no error in the admission of a photograph of a two-year-old victim, despite the defendant's claim that it was "too cute" and thus prejudicial. *New v. State*, No. 2-03-506-CR, 2005 WL 248526, *11-12 (Tex.App.--Fort Worth Feb. 3, 2005, pet. ref'd)(not designated for publication)(finding that the photograph was more probative than prejudicial as it showed what victim looked like prior to his injuries and that the jury was entitled to know victim's identity, including his physical appearance, before the injuries occurred).

Appellant complains of the admissibility of a photograph showing the victim in his military uniform because its probative value is substantially outweighed by its prejudicial effect. This argument fails under the Rule 403 balancing test. First, like *Burns* and *New*, this photograph was probative on the issue of the victim's identity, which the State had a burden to establish. The State

-15-

offered the photograph so that the jury could identify what the victim looked like before he was murdered. The trial court even took steps to eliminate any prejudicial effect by admitting the photograph only after the State cropped the victim's medals off of his uniform so that they were no longer visible. Second, this photograph did not depict a gruesome image of the victim. Potts was clothed and the photograph showed his appearance before his death; it was not inherently prejudicial. *See Burns*, 2001 WL 958118 at *3 (finding photograph of victim in church holding a Bible was not prejudicial because it was not gruesome). Third, little time was spent introducing and discussing the photograph. The discussion concerning the photograph made up only two and a half pages of the record. Therefore, the State was not concerned with developing the identity issue of the victim before the murder. *See Burns*, 2001 WL 958118 at *3. Finally, the photograph was the only picture offered to show the identity of the victim before his death. The record did not indicate that there were other photographs of the victim, except for those depicting him after he had been shot, which would have been more prejudicial than the one introduced. *See Burns*, 2001 WL 958118 at *3. Because the trial court could only weigh the uniform picture against the other evidence and the State was required to establish the identity of the victim, the court did not abuse its discretion by finding that the photograph was more probative than prejudicial. We overrule Issue Eight.

**REQUEST FOR JURY SHUFFLE**

In Issue Nine, Appellant contends that the trial court erred by denying his request for a jury shuffle. A defendant has the absolute right to a shuffle of the jury panel. *See* TEX.CODE CRIM.PROC.ANN. art. 35.11 (Vernon 2006); *Jones v. State*, 833 S.W.2d 146, 147 (Tex.Crim.App. 1992). To be timely, the motion must be made before voir dire begins. *Yanez v. State*, 677 S.W.2d 62, 71 (Tex.Crim.App. 1984); *Richardson v. State*, 981 S.W.2d 453, 456 (Tex.App.--El Paso 1998,

-16-

pet. ref'd). In non-capital cases, voir dire commences when the State begins its examination of the prospective jurors, not when the judge begins his or her initial instructions. *See Williams v. State*, 719 S.W.2d 573, 577 (Tex.Crim.App. 1986); *Richardson*, 981 S.W.2d at 456. In capital felony cases, however, voir dire commences when the trial court begins its examination of the panel. *Davis v. State*, 782 S.W.2d 211, 216 (Tex.Crim.App. 1989); *Railsback v. State*, 95 S.W.3d 473, 481 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd).

In *Davis*, a capital case, the Court of Criminal Appeals found the defendant's motion for a jury shuffle untimely because he had had time to review jury answers to individual questionnaires. *Davis*, 782 S.W.2d at 214 (holding that the Legislature did not intend to have the jury shuffled based on information obtained either during voir dire or from juror information cards). Additionally, the request was made after the trial court had conducted the initial jury examination and some of the members had been dismissed due to pretrial publicity. *Id.* at 215. In *Railsback*, the First Court of Appeals affirmed the trial court's denial of a jury shuffle after the defendant had already seen the panel and the jury was questioned at length by the trial judge. *Railsback*, 95 S.W.3d at 483 (holding that the defendant no longer had an absolute right to a jury shuffle after delaying his request so that he might obtain information traditionally acquired through voir dire).

Appellant relies on *Williams v. State* to support his argument that the request was timely. In *Williams*, the request for a jury shuffle was denied as untimely because the trial judge had examined the jury for approximately forty minutes. *Williams*, 719 S.W.2d at 574. The Court of Criminal Appeals found that the motion was timely, holding that voir dire did not commence until the State was recognized by the court and proceeded with examination. *Id.* at 577. But *Williams* involves a charge of aggravated sexual assault, a first-degree felony, and Appellant faces a capital murder

charge, a capital felony. In capital felony cases, voir dire commences when the trial court begins examination of the panel. *Davis*, 782 S.W.2d at 216; *Railsback*, 95 S.W.3d at 481. In Appellant's case, voir dire was conducted over a two-day period. On the first day, jurors were excused due to exemptions and disqualifications. Some were dismissed because they had read about the case in the newspaper or seen the surveillance video on the news and already formed a conclusion about the case. *Id.* After some instructions from the court, the remaining jurors filled out a questionnaire and were released until 9 a.m. the following day. Appellant requested a jury shuffle the following morning, after he reviewed the jury questionnaires. The trial judge denied his request as untimely because voir dire had already started. The trial court began voir dire by dismissing jurors for exemptions and distributing jury questionnaires. Appellant also had time to review the jury questionnaires before his request for a shuffle. Because Appellant's request to shuffle was untimely, the trial court did not err in denying it. Issue Nine is overruled.

## WRITTEN CONFESSION AND ORAL STATEMENTS

In Issues Ten and Eleven, Appellant challenges the denial of a motion to suppress his written and oral statements. The State responds that Appellant's complaints are moot because it did not introduce either statement into evidence. *See Sanders v. State*, No. 05-98-01889-CR, 2001 WL 436331, *6 (Tex.App.--Dallas May 1, 2001, no pet.)(not designated for publication)(holding Appellant's complaint that trial court erred in denying his motion to suppress a written statement was moot because it was not admitted into evidence before a jury).

Appellant was escorted to El Paso from a home in Chaparral, New Mexico by Detective Antonio Tabullo. On the way to El Paso, Appellant told Tabullo that he was sorry for what happened and that "[i]t shouldn't have happened that way." When Tabullo reached his office,

-18-

Appellant told him the whole story and Tabullo prepared a written statement. Appellant read the prepared statement and initialed it for accuracy. This voluntary statement was admitted into evidence for the hearing on Appellant's motion to suppress with no objection. The record does not reflect that these statements were admitted into evidence before the jury. Therefore, his complaints are moot and the trial court did not abuse discretion in denying the motion to suppress. *See Sanders*, 2001 WL 436331 at *6. We overrule Issues Ten and Eleven and affirm Appellant's conviction of capital murder.

February 19, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

(Publish)