

## NUMBER 13-08-00283-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

CARLOS ANTONIO GONZALES,                                   Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

### On appeal from the 105th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

Appellant Carlos Antonio Gonzales complains of the jury's verdict convicting him of

capital murder and sentencing him to life in prison.[1]  *See* TEX. PENAL CODE ANN. §§

12.31(a), 19.03(a)(2) (Vernon Supp. 2009).  By eight issues, Gonzales argues that:  (1) his

right under the Confrontation Clause was violated when the State cross-examined him

---

[1]The State did not seek the death penalty in Gonzales's case.

using the statement of his co-defendant, *see* U.S. CONST. amend VI; (2) his right under the Confrontation Clause was violated during the testimony of the police detective who investigated the case, *see id.*; (3) the trial court abused its discretion by failing to charge the jury on the lesser-included offense of felony murder; (4) the trial court abused its discretion by failing to grant Gonzales's motion for juror information after good cause was shown; (5) his constitutional right to an impartial jury was violated when two jurors withheld certain information during voir dire, *see id.*; (6) the trial court abused its discretion by denying Gonzales's motion for new trial on the basis that two jurors failed to disclose material information; (7) the trial court abused its discretion by admitting multiple photographs of the scene of the murder and the autopsy; and (8) the cumulative harm from the multiple constitutional, procedural, and evidentiary errors deprived Gonzales of a fair trial. We reverse and remand for a new trial.

## I. BACKGROUND

On February 22, 2007, Victor Morales was found dead in his home by his wife, Tracy Romero, when she returned home from work in the early evening. Romero found Morales lying on the floor by the front door of the house in a pool of his own blood; it appeared that Morales had sustained severe head injuries. There was property missing from the house, including some jewelry and a five-gallon jug of loose change. Gonzales and his co-defendant Pablo Padilla became suspects in the case when it was discovered that they had pawned the jewelry missing from Morales's house.[2] However, the nature of Morales's death and events surrounding it remained a matter of great dispute.

---

[2]Pablo Padilla was also convicted for the capital murder of Morales. We affirmed the conviction on August 20, 2009. *See Padilla v. State*, No. 13-08-00470-CR, 2009 Tex. App. LEXIS 6552, at *16 (Tex. App.–Corpus Christi Aug. 20, 2009, pet. filed) (mem. op., not designated for publication).

2

On May 17, 2007, Gonzales was indicted for capital murder and theft.[3]  Gonzales pleaded not guilty, and the case proceeded to trial on February 12, 2008.  At the three-day trial, the jury heard the following testimony and evidence:

David Curtiss

Curtiss, a crime scene investigator for the Corpus Christi Police Department (CCPD), generally described the crime scene.  He noted that there were blood spatters throughout the house and that the furniture in the living room was out of place, which could indicate that there had been a fight.  Curtiss further testified that the drawers in the bedrooms had been opened and that it appeared to him as if the place had been ransacked.  Curtiss noted that the following were found at the scene:  two handguns, one under the mattress and one in the nightstand drawer; and remnants of marihuana cigarettes and a hundred-dollar bill, both found in the trash can.

Tracy Romero

Romero testified that Morales had a pit bull that was very protective of the family; she stated that Morales would chain the pit bull outside if someone came to the house whom the dog did not know.  Romero testified that, when she returned home on February 22, 2007, the pit bull was chained up in the backyard.  Romero also discussed Morales's history of drug dealing.  She testified that Gonzales had been to her home before and she was once with Morales at the Sonic near their house when Gonzales met up there with Morales.  Romero stated that, at some point in 2006, she separated from Morales because of his drug business.  She stated that she returned to Morales because she believed he had stopped dealing drugs, but the night before Morales's death, she and Morales had an

<hr />

[3]The State declined to pursue the theft charge.

3

argument because she believed he might be dealing drugs again. Romero testified that Morales smoked marihuana on a near-daily basis; she admitted that she threw Morales's marihuana "roaches" in the trash before the police arrived.

R.G. Hernandez

Hernandez, Morales's brother-in-law, testified that Morales told him that he had $20,000 in cash at the house. Hernandez stated that Morales often bragged to him and others about such things.

Richard L. Garcia

Garcia, the lead CCPD detective on the case, testified that he arrived on the scene shortly after Romero called 911 to report the killing. Garcia noted the blood spatter and displaced furniture at the scene and, like Curtiss, stated that it was possible that there had been a struggle or a fight. Also, like Curtiss, Garcia believed that the house had been ransacked. Garcia testified that the two guns found in the house and the pit bull were evidence that Morales was a drug dealer. When asked by defense counsel if it was possible that someone had come to the house to do a deal and the deal had gone badly, leading to Morales's murder, Garcia stated that this scenario was possible.

Garcia testified that Gonzales became a suspect in the case when he learned of rumors floating around Mathis, Texas—a small town outside of Corpus Christi—that Gonzales and Padilla were involved in the killing and were trying to sell the jewelry they had taken from the house. Garcia then sent a notice out to pawn shops in the area that returned information that both Gonzales and Padilla had been pawning several pieces of

jewelry, which were later identified as those taken from Morales's house.[4] Garcia testified that he arrested Gonzales shortly thereafter, in early March 2007. Garcia testified that, in the statement Gonzales gave Garcia after his arrest, Gonzales stated that he and Padilla thought there would be more money at Morales's house and that Gonzales did not go into the house to hurt Morales.

Garcia testified that Padilla gave a statement in September 2007 and, after giving the statement, took Garcia to a caliche pit in Mathis where Padilla stated the murder weapon had been dumped. In the caliche pit, Garcia found a heavy tire checker tool and a pair of gloves, which Padilla identified as the weapon used to kill Morales and the gloves used in the incident.[5]

Ray Fernandez

Fernandez, the Nueces County medical examiner who performed the autopsy on Morales's body, testified that Morales had suffered severe head injuries and that the cause of death was blunt force trauma to the head. He noted that the back of Morales's skull was depressed, which could have been caused by a tire checker tool of the type found by Garcia at the caliche pit, and that he had injuries to the front and side of his head consistent with being kicked in the face. When questioned by defense counsel, Fernandez stated that the injuries could also be consistent with a fist fight. However, Fernandez also noted that Morales had no markings on his fists or broken fingernails that would indicate he had been fighting with his fists.

---

[4]Gonzales does not dispute that he pawned some of the jewelry that was taken from Morales's house.

[5]Evidence at trial showed that a tire checker is a heavy club used by truckers to test the tires on their eighteen-wheeler trucks.

## Guadalupe Rodriguez

Rodriguez, another CCPD detective investigating the case, testified that her investigation revealed that there had been considerable drug traffic in and out of Morales's house. She also confirmed Curtiss's findings, noting that twenty-one marihuana "roaches" were found in the house. Rodriguez discussed the results of the police's pawn shop investigation but specifically noted, without objection, that the fact the jewelry was pawned did not necessarily mean Gonzales and Padilla intended to murder Morales.

## Alvaro Andrade

Andrade, Gonzales's brother, testified that Morales was a drug dealer. He stated that he had been to Morales's house with Gonzales and Padilla several times so that Gonzales could buy drugs from Morales. He testified that he had been in the house only once and that, typically, Morales would come out to their car to transact with Gonzales. Andrade testified that when he went into the house, Morales chained up his pit bull in the backyard.

## Carlos Gonzales

Gonzales himself testified at trial. He admitted that he was a cocaine dealer. He testified that he bought large volumes of cocaine from Morales on a regular basis. Gonzales stated that he owed Morales $1,000 at the time of Morales's death.

In his testimony at trial, Gonzales blamed Padilla for the murder. He testified that, on the day in question, Padilla asked Gonzales to drive him to Morales's house so he could buy some drugs. Gonzales stated that he pulled up to the house, Padilla exited the car, knocked on Morales's door, and Morales let Padilla in the house. Gonzales testified that around five minutes later, Padilla opened the front door of the house and waved to

6

Gonzales to come in. Gonzales stated that he walked up to the house and, when he got to the front door, he saw Morales laying on the floor with blood all around his head. Gonzales testified that Padilla told him to start taking property from the house, but Gonzales refused and went back to the car. Gonzales further testified that when Padilla returned to the car, he was carrying a tire checker tool that he placed in a box in the backseat of the car. Gonzales stated that he did not learn until later in the evening that Morales was dead.

The State then attempted to impeach Gonzales with Padilla's statement to the police. In the statement, Padilla stated that Gonzales had been the one to commit all the acts previously described by Gonzales while Padilla waited in the car.[6]

At trial, the jury also watched the video recording of the statement Gonzales gave to the police after his arrest.[7] During the statement, Gonzalez gave somewhat conflicting versions of the events. At first, Gonzales denied any knowledge. As the interview progressed, however, Gonzales began to be more forthcoming. Referring to Morales's killing, Gonzales stated that he "didn't know that was going to happen." Gonzales told the police detective that he and Padilla went to Morales's house to rob him and that things got out of hand and Padilla hit Morales in the head with a black tool. Gonzales stated that "it

---

[6]Counsel for Gonzales objected to the State's use of Padilla's statement on Confrontation Clause grounds. *See* U.S. CONST. amend VI.

[7]Gonzales challenged the voluntariness of his statement to police in a motion to suppress, which was denied after a hearing. Counsel for Gonzales also attacked the voluntariness of the statement at trial. Further, the jury charge included an instruction requiring the jury to find that the statement was voluntary before considering it as evidence. Gonzales does not challenge the voluntariness of his statement on appeal.

wasn't supposed to be like that." Throughout the statement, Gonzales maintained that he never hit Morales.

At the close of the evidence, the trial court heard argument from the State and defense counsel about various issues with respect to the court's charge to the jury. Specifically, counsel for Gonzales requested that the charge include the lesser-included offense of felony murder because there was evidence at trial that the killing of Morales was not intentional. The trial court denied the request. The jury returned a guilty verdict, convicting Gonzales of capital murder and sentencing him to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. This appeal ensued.

## II. LESSER INCLUDED OFFENSE

By his third issue, Gonzales argues that the trial court abused its discretion in failing to charge the jury on the lesser-included offense of felony murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2003). We agree.

### A. Standard of Review and Applicable Law

Texas courts employ a two-prong test to determine whether a jury charge on a lesser-included offense must be given. *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (en banc); *see also Bargas v. State*, No. 13-06-00372-CR, 2007 WL 2459194, at *6 (Tex. App.–Corpus Christi Aug. 31, 2007, no pet.) (mem. op., not designated for publication). First, we determine whether the lesser offense is a lesser-included offense of the charged offense. *Threadgill*, 146 S.W.3d at 665. In other words, the elements of the lesser offense must be included within the proof necessary to establish

8

the charged offense. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(a) (Vernon 2006); *Schweinle v. State*, 915 S.W.2d 17, 18 (Tex. Crim. App. 1996) (per curiam).

Second, we determine whether there is some evidence that would permit a rational jury to find that, if guilty, the defendant is guilty only of the lesser offense. *Threadgill*, 146 S.W.3d at 665; *see Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (per curiam). In other words, "[t]he evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Threadgill*, 146 S.W.3d at 665. We consider all of the evidence introduced at trial, whether produced by the State or by the defendant. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000). In considering the evidence for purposes of the second prong, we do not judge the credibility of the evidence or whether it conflicts with other evidence. *Saunders*, 840 S.W.2d at 391. Thus, because we are not to weigh the strength or weakness of the evidence, an instruction on the lesser-included offense is warranted if we find "[a]nything more than a scintilla of evidence from any source" from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser. *Schweinle*, 915 S.W.2d at 18; *see Saunders*, 840 S.W.2d at 391; *see also Bargas*, 2007 WL 2459194, at *6.

The evidence can indicate a defendant is guilty of only the lesser offense in one of two ways. *See Saunders*, 840 S.W.2d at 391. First, if the evidence either "affirmatively refutes or negates an element establishing the greater offense," the lesser-included offense is raised. *Schweinle*, 915 S.W.2d at 19. Second, "a defendant may be shown guilty only of the lesser offense if the evidence presented is subject to two interpretations." *Saunders*, 840 S.W.2d at 392; *see Ross v. State*, 861 S.W.2d 870, 875 (Tex. Crim. App.

9

1992) ("Where the evidence given at trial is subject to two reasonable inferences, the jury should be instructed on both inferences.").

If we find error in the charge submitted to the jury, we must still determine whether sufficient harm resulted from the error to require reversal. *See Ross*, 861 S.W.2d at 875. A properly preserved error in the jury charge requires reversal if the error was "calculated to injure the rights of defendant." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1986) (op. on reh'g); *see Saunders v. State*, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995) (en banc) (applying the *Almanza* standard in a case where the objected-to error was failure to include an instruction on a lesser-included offense). A showing of injury requires nothing more than there be "some harm" to the defendant because of the error. *Almanza*, 686 S.W.2d at 171. "[T]he presence of any harm, regardless of degree, is sufficient to require a reversal of the conviction." *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999) (en banc).

## B. Analysis

It is well-established that felony murder is a lesser-included offense of capital murder, so the first prong of the test is met. *See Threadgill*, 146 S.W.3d at 665; *see also Bargas*, 2007 WL 2459194, at *6 (citing *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005)). The crucial question on appeal, then, is whether there was more than a scintilla of evidence that if Gonzales committed an offense, he committed only the offense of felony murder. *See Threadgill*, 146 S.W.3d at 665.

"The element distinguishing capital murder from felony murder is the intent to kill." *Id.* Felony murder is an unintentional killing committed in the course of committing a

10

felony; capital murder is an intentional killing committed in the course of committing, among other offenses, robbery. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 19.03(a)(2). Thus, in the context of felony murder based on robbery, to be entitled to the instruction on the lesser-included offense, "there must be some evidence that would permit a jury rationally to find the defendant had the intent to commit robbery but not to cause the death of the victim." *Threadgill*, 146 S.W.3d at 665.

Here, there was ample evidence at trial that Morales was a serious drug dealer and that he may have had large amounts of cash and drugs in his house, all circumstantial evidence of a possible motive for the robbery. Curtiss and Garcia both testified that the physical evidence from the scene—in particular, the blood spatters and displaced furniture—could be consistent with a struggle or fight in the house. Fernandez stated that Morales's injuries could be indicative of a fist fight. Rodriguez testified that Gonzales and Padilla's pawning of the jewelry did not necessarily prove that they intended to kill Morales. In the statement he gave police, Gonzales admitted that he and Padilla went to the house to rob Morales but that he did not intend for things to turn out the way they did. He stated that the situation got out of hand and that Padilla hit Morales on the head. Because the evidence is subject to multiple interpretations, *see Saunders*, 840 S.W.2d at 392; *Ross*, 861 S.W.2d at 875, we believe an instruction on the lesser-included offense of felony murder was warranted. *See Saunders*, 840 S.W.2d at 391 (holding that the reviewing court is not to weigh the strength or weakness of the evidence). In other words, there was more than a scintilla of evidence at trial that, although Gonzales and Padilla intended to

11

rob Morales, they did not intend to kill him.  *See Threadgill*, 146 S.W.3d at 665; *Schweinle*, 915 S.W.2d at 18.

The State argues that Gonzales was not entitled to a lesser-included instruction on felony murder because there was no evidence that the murder of Morales was anything but intentional.  *See Gonzalez v. State*, 296 S.W.3d 620, 626-27 (Tex. App.–El Paso 2009, pet. filed); *Flores v. State*, 215 S.W.3d 520, 530 (Tex. App.–Beaumont 2007), *aff'd on other grounds*, 245 S.W.3d 432 (Tex. Crim. App. 2008); *Mohammed v. State*, 127 S.W.3d 163, 167-68 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd).  The State asserts that an instruction on the lesser-included offense of felony murder is not proper unless there is some evidence at trial that the defendant committed a felony and, "in the course of and in furtherance" of the crime, "commit[ted] an act clearly dangerous to human life that cause[d] the death of an individual."  *See* TEX. PENAL CODE ANN. § 19.02(b)(3); *Mohammed*, 127 S.W.3d at 167.  Our review of the evidence presented at trial has revealed evidence relevant to this issue.  There was evidence at trial that the murder weapon was a tire checker tool and that this tool was used to hit Morales in the head.  As previously discussed, the testimony at trial also indicated that there may have been a struggle or fight before Morales's death.  This evidence is subject to more than one interpretation.  It could be interpreted as proof that whoever hit Morales intended to kill him.  Or—especially in combination with the evidence that there might have been a fight and Gonzales's testimony that he was unaware that Morales was dead until later in the evening—it could be interpreted as proof that there was an altercation that escalated beyond the intentions of Gonzales and Padilla and resulted in Morales's death.  If the evidence considered at trial

12

is subject to two reasonable inferences, the jury should be instructed on both inferences. *See Saunders*, 840 S.W.2d at 392; *Ross*, 861 S.W.2d at 875. Here, based on the evidence before it, the trial court erred in refusing to instruct the jury on felony murder because there was evidence from which a rational jury could have concluded that Gonzales was guilty only of, in the course of robbing Morales, committing an act clearly dangerous to human life that led to Morales's death.[8] *See Schweinle*, 915 S.W.2d at 18; *see also Bargas*, 2007 WL 2459194, at *6.

Having concluded that the trial court erred in failing to instruct the jury on the lesser-included offense of felony murder, we now turn to whether that error sufficiently harmed Gonzales so as to require reversal of his conviction. *See Almanza*, 686 S.W.2d at 171. The Texas Court of Criminal Appeals has reasoned that "some harm" has befallen a defendant where "the trial court failed to submit a lesser[-]included offense that was requested and raised by the evidence" and "where that failure left the jury with the sole option either to convict the defendant of the greater offense or to acquit him." *Saunders*, 913 S.W.2d at 571. In such a case, "some" harm occurs because "the jury was not permitted to fulfill its role as factfinder to resolve the factual dispute whether the defendant

---

[8]The State also argues that Gonzales is judicially estopped from complaining of the trial court's failure to charge the jury on the lesser-included offense because Gonzales relies on the statement he earlier challenged as involuntary in making his complaint. *See Schmidt v. State*, 278 S.W.3d 353, 358 (Tex. Crim. App. 2009) (holding that the equitable rule of judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase). However, as previously detailed, Gonzales's statement was not the only evidence supporting the lesser-included offense. There was evidence at trial that Morales was a serious drug dealer who possibly had large stores of cash and drugs, which is circumstantial evidence of Gonzales and Padilla's motive to rob Morales. Moreover, the testimony of Curtiss, Garcia, Fernandez, and Rodriguez all provided circumstantial evidence that the killing of Morales may not have been intentional. *See Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (requiring us to consider all evidence presented at trial to determine whether a lesser-included charge is warranted); *Schweinle v. State*, 915 S.W.2d 17, 18 (Tex. Crim. App. 1996) (per curiam). Therefore, we are unpersuaded by the State's estoppel argument.

13

committed the greater or lesser offense." *Id.* The jurors at Gonzales's trial were faced with just such a scenario. Moreover, with regard to punishment, the jurors were presented with only two options: (1) convicting Gonzales and sentencing him to life in prison without parole; or (2) acquitting Gonzales and setting him free. *See* TEX. PENAL CODE ANN. § 12.31(a). By contrast, the punishment range for felony murder is five to ninety-nine years. *See id.* § 12.32(a) (Vernon Supp. 2009).

Based on the foregoing facts and analysis, we cannot conclude that there was no harm in the trial court's error. *See Dickey*, 22 S.W.2d at 492. Rather, we conclude that, as previously discussed, where the evidence at trial raised the issue of felony murder, Gonzales indeed suffered "some harm" because the jury was not instructed on, and thus not allowed to consider, the lesser offense—and lesser punishment range—of felony murder. *See Almanza*, 686 S.W.2d at 571; *see also Ross*, 861 S.W.2d at 877 (op. on reh'g). Gonzales's third issue is sustained.

Having determined that the trial court erred in failing to instruct the jury on the lesser included offense of felony murder and that Gonzales was harmed by this error, we need not reach Gonzales's remaining issues. *See* TEX. R. APP. P. 47.1; *Ross*, 861 S.W.2d at 877 (remanding case to trial court after finding error and harm resulting from trial court's denial of instruction on lesser-included offense of felony murder); *see also Johnson v. State*, No. A14-92-01036-CR, 1994 WL 668229, at *4 (Tex. App.–Houston [14th Dist.] Dec. 1, 1994, pet. ref'd) (not designated for publication) (same).

14

### III. CONCLUSION

Gonzales's judgment of conviction is reversed, and we remand to the trial court for a new trial. *See Ross*, 861 S.W.2d at 877; *see also Johnson*, 1994 WL 668229, at *4.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 4th
day of February, 2010.