

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00073-CR

MALCOLM JAMAR STRICKLAND                                    APPELLANT
A/K/A MALCOLM J. STRICKLAND

V.

THE STATE OF TEXAS                                               STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In one issue, Appellant Malcolm Jamar Strickland a/k/a Malcolm J. Strickland asserts that the evidence was legally and factually insufficient to support his capital murder conviction. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

The indictment alleged that Appellant intentionally killed Michael Myers by shooting him with a firearm while in the course of committing robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2011). The State did not seek the death penalty. Appellant pleaded not guilty to capital murder, but the jury found him guilty of that offense. The trial court sentenced Appellant to life imprisonment without parole. *See id.* § 12.31 (West 2011).

## III. Analysis

In his sole issue, Appellant asserts that the evidence fails to establish that he had the requisite intent to murder Myers in the commission of a robbery. Appellant contends that he intended to commit theft and that he shot Myers "not with the intent to murder [him], but out of fear because Myers was attacking him with weapons."

### A. Applicable Facts

In the early morning hours of April 21, 2008, fifty-nine-year-old Myers, the night clerk at a Tarrant County Best Western motel, was found shot to death behind the check-in counter. Hotel surveillance video cameras inside and outside the motel captured the assailant's actions before and after the offense. News channels aired portions of the video, and the police received a crime stoppers tip the next day. The police arrested Appellant two days after the offense.

The video footage showed that two individuals (later identified as Appellant and Jay Allen) entered the Best Western at approximately 1:39 a.m. They approached the check-in counter and then immediately exited the motel. Approximately two hours later, Appellant appeared back inside the motel alone wearing sunglasses and different clothes, and he roamed the halls for several minutes holding a silver handgun by his side. He then entered the front lobby from an inside hallway and jumped over the check-in counter into the workspace behind it. Less than thirty seconds later, Appellant jumped back into the lobby, waited a few seconds, and then jumped back over the counter. Approximately two minutes later, Appellant jumped over the counter, into the lobby, and exited out the front door. The surveillance camera above the check-in counter that could have captured Appellant's actions, was not working at the time.

Appellant gave two statements to investigators. During his interview three days after the offense, Appellant claimed that when he entered the lobby alone the second time (after selling drugs to a motel guest), he did not see anyone behind the counter, saw the open cash register, and decided to "steal something." When he jumped over the counter, he saw a man lying on the ground with a gunshot wound to his throat, still alive but "dying slowly." He immediately left the scene and did not call 911 because he did not want to get involved.

Approximately one month later, Appellant admitted to lead investigator Detective Frank Serra that after he returned to the Best Western alone, jumped

3

the counter, and put the cash register money into his pocket, Myers "rushed" toward him with a three-hole punch, "pushed him," and was about to "whoop [his] ass." Appellant "froze," closed his eyes, and "just shot and ran." When asked about the other two shots, Appellant stated, "I think I hit him once, and I guess I kept shooting." Appellant also stated that he "pulled the trigger" but that he did not remember how many times. Appellant explained that Myers was "just going to beat me up or something and hold me until the police come." Appellant stated, "I told [Myers] I didn't want to shoot him when he pushed me on the ground. I know I tried to talk to the dude." Appellant explained that he was "on too many pills" and that it "just happened." When asked about Myers's missing wallet, Appellant denied taking it. When confronted with evidence that he did, however, he stated he did not remember taking it.

At trial, Appellant's longtime friend Antonio Smith testified that Appellant came to his apartment (at the Sun Ridge Apartments near the Best Western) the morning of the offense. Appellant was panicky and pacing, had small blood spots on his shirt, and had a gun in his back pocket. Appellant tossed a wallet on the bed containing Myers's identification, other "cards," and two dollars. Appellant repeatedly stated, "I just shot somebody," and "The dude got up and it went wrong."[2]

---

[2]A maintenance man at the Sun Ridge Apartments found the wallet in the trash can and turned it in to his manager, who turned it in to the authorities.

Shakitha Titus testified that Appellant was a friend and that she picked him up at the Sun Ridge Apartments the morning of the offense. Titus drove Appellant around that day and at one point asked him what happened at the motel. Appellant explained that he had been "high" at the time, not in his right mind, and had gotten scared when the man, who was bigger than he was, grabbed at him; Appellant thought the man was going to take the gun from him. Appellant told Titus, "It was an accident. It was self-defense," and Titus testified that Appellant was very remorseful.

Ashley Williams testified that she saw Appellant the evening after the offense when she was standing outside her apartment talking to her friend Briana Petite. Appellant walked up, talked to them, and stated he had killed the man in the motel. Williams recounted Appellant's statements that the man had come up on him like he was going to punch him in the face and that Appellant had shot him in the neck, head, and chest. Appellant also stated he had taken more than one Xanax before the offense and had acted in self-defense.

Tim Franklin testified that he had been at Williams's apartment that evening and had overheard Appellant talking on a phone. Franklin heard Appellant say that he killed "the dude," that he did not want to do it, that he watched "the dude die," and that he had to "get away" because he did not want anyone to know what he had done.

Kim Simon, the mother of Appellant's girlfriend Laquita Reaves (with whom Appellant had a child), testified that she recognized Appellant from a recording of

5

the video on the nightly news. She stated that Appellant came to her home within a day or two of the offense. When Appellant watched the video footage of the offense, he cried and claimed he did not know what happened. Simon advised Appellant to turn himself in to authorities but drove him to the Trinity River so he could "throw away a gun." Simon assumed it was the gun he used at the Best Western, and she saw Appellant throw the "wrapped up" gun into the water. Simon did not initially call the police but eventually showed them the area where she believed Appellant had thrown the gun. The gun was never recovered.

Tarrant County Deputy Medical Examiner Dr. Lloyd White testified that Myers's autopsy revealed three gunshot wounds—one to the upper left front of the neck and two to the right front chest. In Dr. White's opinion, the cause of death was "penetrating handgun wounds of the chest" (each of which would have been fatal), and the manner of death was homicide. Dr. White testified that he could not determine whether the shooting occurred while Myers was standing, kneeling, or sitting. Dr. White testified that the shots were fired from an "indeterminant" range, meaning "somewhere between contact and typically around 18 inches or two feet or so," specifically, "beyond a foot or foot and a half, particularly for the neck wound."[3] Appellant's expert estimated that Appellant

---

[3]He explained that if the weapon had been available to test fire, an evaluation concerning any powder residue on the clothing could have yielded a more precise distance.

shot at Myers from a distance of one to three feet. The medical examiner's investigator, Michael Floyd, testified that the blood scene evidence indicated that Myers had tried to get to the telephone before he died.

Appellant testified that at the time of the offense he was eighteen years old and made money by selling small quantities of cocaine and marijuana to guests staying at the Best Western and two other nearby motels. He explained that in the hours before the incident, he had been smoking marijuana, drinking beer, and had ingested eight to nine Xanax[4] and that he "wasn't sober" and "wasn't in [his] right mind."[5] He testified that he had obtained the gun only a few hours before the offense when a friend asked him to hold his pistol while he made a drug sale. When the friend did not return, Appellant left the area with the gun, which was already loaded.

Appellant explained that he and Jay Allen initially went into the Best Western to get change for a hundred dollar bill and encountered Myers, who immediately said he did not have change and closed the open cash drawer.

---

[4]Forensic toxicology consultant Dwayne Fuller testified on Appellant's behalf. He explained that Xanax is an anti-anxiety medication that is sometimes used to treat depression and that it can cause loss of memory; the higher the dose, the stronger the effects. Fuller testified that the person would have "trouble storing the memories . . . of the events . . . taking place . . . at the time [he or she was] under the influence of this drug."

[5]When the prosecutor stated on cross-examination, "You look mighty agile for somebody who's that drunk," Appellant responded, "I have a high tolerance for the pills. I been popping pills for a long amount of time and they don't—they don't just do me like they'll do somebody the first time who pop them."

7

Appellant testified that a couple of hours later he went back to the Best Western

alone. The following dialogue occurred:

> Q. [Defense Counsel]: What was your purpose of going [to the Best Western]?
>
> A. [Appellant]: To make a drug sale. Then I – I – I – I – I was fixing to go down the hallway because I remembered that cash register being open. I popped all those pills and I was thinking I got to go in there and go in the cash register and take all the money out.
>
> . . . .
>
> Q. When you went around that corner, did you see Mr. Myers there?
>
> A. No, sir.
>
> Q. So when you did not see him, what was your plan?
>
> A. Jump the counter and get that register open.
>
> . . . .
>
> Q. When is the first he confronted you or you confronted him?
>
> A. I jumped over the register deal like I thought I was going to do. . . . I was going through – I had my hand on it and going through it and I was putting [money] in my pocket.
>
> . . . .
>
> And I put it in my pocket and I heard somebody yell, What the hell are you doing? And before I looked back, he hit – hit me and he had some – and I don't know – I – I told them it was a three-ring hole punch, but that was just all I seen was something black. I don't know.
>
> . . . .

8

Q.  [What] [w]as he saying to you?

A.  Yeah.  First he was like "What the hell are you doing?"  He probably wasn't going to kill me, but he said he was . . . .

Q.  What exact words?

A.  "What the hell are you doing?"  And he hit me with the thing and he kept asking "What are you doing?"  He said, "I'm going to kill your ass."  And he kept asking "What are you doing?  When he – when he caught me, I just froze.  And when he hit me and stuff, I didn't know what to do.  *But he kept attacking me so I had to – I had to do that.*

Q.  When you shot, where was the gun?  Where was the gun?  Do you know?

A.  It was on my waist.  He didn't see the gun.  Otherwise I don't think he would have done — if I had the gun out, if I would have robbed him – I could have robbed him from the other side of the [counter].

. . . .

Q.  When you finally got the gun out, what did you do, [Appellant]?

A.  I got it out, he pushed me.  He – I fell back – back against the – I didn't fall back against him, but I felt someone – when he was coming, I dodged.  I – I thought he was going to hit me and I dodged.  I just shot in his vicinity where he was.

. . . I thought I shot him once.

[Emphasis added.]

The trial court's charge instructed the jury to determine, in turn, whether Appellant was guilty of capital murder, felony murder, simple murder, or not guilty.  *See* Tex. Penal Code Ann. §§ 19.02(b)(1)–(3) (West 2011), 19.03(a)(2).

9

Appellant's theory of defense in his testimony and his counsel's closing argument was that he did not possess the requisite intent to murder Myers and that he was, at most, guilty of the lesser-included offense of felony murder. The jury found Appellant guilty of capital murder. The charge instructed the jury that voluntary intoxication does not constitute a defense to the commission of a crime. S*ee id*. § 8.04 (West 2011).

## B. Applicable Law

As relevant in this case, a person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery.[6] *See id.* § 19.03(a)(2). A person commits robbery if, in the course of committing theft, he intentionally or knowingly causes bodily injury to another. *See id.* § 29.02(a) (West 2011). The State must prove a nexus between the murder and the theft, i.e., that the murder was committed to facilitate the taking of the property. *Cooper v. State*, 67 S.W.3d 221, 223 (Tex. Crim. App. 2002); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986).

"A person acts intentionally . . . with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." Tex. Penal

---

[6]Capital murder requires an intent to kill. *See id.* § 19.03(a)(2). In comparison, "felony murder" is an unintentional murder committed in the course of committing a felony. *Id*. § 19.02(b)(3); *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App., *cert. denied*, 528 U.S. 1026 (1999). Noncapital murder includes intentionally or knowingly causing an individual's death or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes an individual's death. Tex. Penal Code Ann. § 19.02(b)(1), (2).

Code Ann. § 6.03 (West 2011). Intent is a fact question for the jury, and it is almost always proven by circumstantial evidence. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *see also Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009), *cert. denied*, 131 S. Ct. 103 (2010). A jury may infer intent from any facts that prove its existence, including acts, words, and conduct of the accused; method of committing the crime; and the nature of wounds inflicted on victims. *See Hart*, 89 S.W.3d at 64; *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.— Houston [1st Dist.] 2009, pet. ref'd), *cert. denied*, 131 S. Ct. 156 (2010). A jury may infer intent to kill from the use of a deadly weapon in a deadly manner. *See Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 938 (2004); *see also Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) ("It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." (internal citations omitted)). In the case of a capital murder committed in the course of a robbery, there is no requirement that the intent to cause death be premeditated or formulated prior to the commission of the robbery. *See Rousseau v. State*, 855 S.W.2d 666, 674 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). Rather, the intent to cause death must only have been formulated when the actor commits the murder. *See id.*

11

## C. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[7] *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011), *cert. denied*, 80 U.S.L.W. 3462 (U.S. Mar. 19, 2012) (No. 11-944).____S. Ct. ____ (2012). We defer to the jury's determinations of credibility and may not substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## D. Analysis

Appellant contends that his intent was to commit theft and that he shot Myers "not with the intent to murder [him], but out of fear because Myers was

---

[7]Because the court of criminal appeals has eliminated the factual sufficiency standard of review from this state's criminal jurisprudence, *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010), we determine only whether the evidence is sufficient to support the jury's verdict.

12

attacking him with weapons." In support, he points to his own testimony and statements and some of the physical evidence.[8]

Even if Appellant's main objective was to steal money, such an objective does not foreclose a finding that he later formed the intent to kill Myers. *See Robertson v. State*, 871 S.W.2d 701, 706–07 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 853 (1994) (holding that appellant's claim that he returned to house solely to steal drugs did not constitute evidence that he could not have formulated an intent to kill between returning to the house and shooting the victim); *Rousseau*, 855 S.W.2d at 674; *see also Threadgill v. State*, 146 S.W.3d 654, 664–65 (Tex. Crim. App. 2004) (noting that, although the defendant's main objective was to steal the car, this did not foreclose a finding that he intentionally killed the victim when he shot at him at close range in the back of the car); *Gonzalez v. State*, 296 S.W.3d 620, 626–27 (Tex. App.—El Paso 2009, pet. ref'd) ("While the [video]tape may show a possibility at some point during the robbery that A.C. did not intend to kill Potts, it does not amount to evidence that A.C. did not intend to cause his death at the time of the shooting.").

---

[8]For instance, Appellant elicited from Detective Serra that the physical evidence was consistent with Appellant's story that Myers was not near the cash register when Appellant first jumped over the counter and that Myers came at him with a three-hole punch. He also relies on Detective Serra's "admissions" on cross-examination that it was logical to assume that no one was standing behind the counter when Appellant jumped over it, that Myers was much larger than Appellant, that Appellant shot him because he was "mad" and going to "whoop" him, and that Appellant claimed his eyes were closed when he fired.

13

The evidence demonstrated that Appellant entered the motel with a loaded gun and that he pulled the trigger three times, fatally shooting Myers twice in the chest. Additionally, Appellant admitted to Detective Serra during his second interview, "I think I hit him once, and I guess I kept shooting," and "I pulled the trigger; I don't remember how many times." Indeed, Appellant made several admissions that belie his claims that he did not have the intent to kill Myers, including that he "tried to talk" to Myers, that he told Myers he did not want to shoot him, and that he "had to do that" because Myers kept attacking him.[9] Appellant also stated that he thought Myers was going to beat him up and call the police; there was also evidence that Myers was trying to reach the telephone when Appellant shot him, which the jury could have reasonably inferred that Appellant's actions were intentional and not merely done as a reflex or in fear. Appellant then fled the scene and did not call 911. The jury could have rationally determined beyond a reasonable doubt that Appellant intentionally caused Myers's death. *See Ex parte Thompson*, 179 S.W.3d at 556*; see also Gonzalez*, 296 S.W.3d at 626–27 ("The fact that A.C. shot Potts in the chest with a .22 and fled the scene with Appellant reinforces the notion that there was intent to kill.");

---

[9]In addition to these incriminating admissions, the jury could have considered that Appellant gave several differing explanations for his actions, including that he found Myers already shot and dying, that he shot Myers by accident, that he shot Myers because he "got up," that he shot Myers in self-defense, and that he shot in the vicinity of Myers with his eyes closed. *See generally Guevara v. State*, 235 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that inconsistent statements and implausible explanations are also probative of wrongful conduct and are circumstances of guilt).

*Motilla v. State*, 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) (indicating that decision to fire more than once is evidence of intent to kill).[10]

Appellant refers us to two cases. *See Robertson*, 871 S.W.2d at 705; *Ibanez*, 749 S.W.2d at 807. In both *Robertson* and *Ibanez*, the defendants admitted intentionally killing their victims but maintained they were not guilty of capital murder because the property they stole was an afterthought. Here, Appellant maintains he did not intentionally kill Myers but admits he intended to steal money. Indeed, there is evidence that Appellant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder. *See Conner*, 67 S.W.3d at 197 ("If there is evidence . . . from which the jury could rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proven that the murder occurred in the course of the robbery.").

Applying the *Jackson* criteria to the facts of this case, we hold that a rational trier of fact could have found beyond a reasonable doubt that Appellant committed capital murder.

---

[10]*See also Goad v. State*, 354 S.W.3d 443, 455 (Tex. Crim. App. 2011) ("If a record contains only circumstantial evidence of deliberate conduct, such as evidence that a victim was shot repeatedly, the State may properly rely on that evidence to establish that the defendant's acts were intentional.") (Alcala, J., concurring).

## IV. Conclusion

Having overruled Appellant's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 22, 2012

16