02-10-073-CR












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.
 02-10-00073-CR

 

 


 
 
 Malcolm Jamar Strickland a/k/a Malcolm J.
 Strickland
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM Criminal
District Court No. 2 OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

In
one issue, Appellant Malcolm Jamar Strickland a/k/a Malcolm J. Strickland
asserts that the evidence was legally and factually insufficient to support his
capital murder conviction.  We affirm.

II.  Procedural Background

The
indictment alleged that Appellant intentionally killed Michael Myers by
shooting him with a firearm while in the course of committing robbery.  See
Tex. Penal Code Ann. ' 19.03(a)(2)
(West Supp. 2011).  The State did not seek the death penalty. 
Appellant pleaded not guilty to capital murder, but the jury found him guilty
of that offense.  The trial court sentenced Appellant to life imprisonment
without parole.  See id. ' 12.31 (West 2011).

III.  Analysis

In
his sole issue, Appellant asserts that the evidence fails to establish that he
had the requisite intent to murder Myers in the commission of a robbery. 
Appellant contends that he intended to commit theft and that he shot Myers “not
with the intent to murder [him], but out of fear because Myers was attacking
him with weapons.”

A. 
Applicable Facts

         
In the early morning hours of April 21, 2008, fifty-nine-year-old Myers, the
night clerk at a Tarrant County Best Western motel, was found shot to death
behind the check-in counter.  Hotel surveillance video cameras inside and
outside the motel captured the assailant’s actions before and after the
offense.  News channels aired portions of the video, and the police
received a crime stoppers tip the next day.  The police arrested Appellant
two days after the offense.

         
The video footage showed that two individuals (later identified as Appellant
and Jay Allen) entered the Best Western at approximately 1:39 a.m.  They
approached the check-in counter and then immediately exited the motel. 
Approximately two hours later, Appellant appeared back inside the motel alone
wearing sunglasses and different clothes, and he roamed the halls for several
minutes holding a silver handgun by his side.  He then entered the front
lobby from an inside hallway and jumped over the check-in counter into the
workspace behind it.  Less than thirty seconds later, Appellant
jumped back into the lobby, waited a few seconds, and then jumped back over the
counter.  Approximately two minutes later, Appellant jumped over the
counter, into the lobby, and exited out the front door.  The surveillance
camera above the check-in counter that could have captured Appellant’s actions,
was not working at the time.

Appellant
gave two statements to investigators.  During his interview three days
after the offense, Appellant claimed that when he entered the lobby alone the
second time (after selling drugs to a motel guest), he did not see anyone
behind the counter, saw the open cash register, and decided to “steal
something.”  When he jumped over the counter, he saw a man lying on the
ground with a gunshot wound to his throat, still alive but “dying
slowly.”  He immediately left the scene and did not call 911 because he
did not want to get involved.

Approximately
one month later, Appellant admitted to lead investigator Detective Frank Serra
that after he returned to the Best Western alone, jumped the counter, and put
the cash register money into his pocket, Myers “rushed” toward him with a
three-hole punch, “pushed him,” and was about to “whoop [his] ass.” 
Appellant “froze,” closed his eyes, and “just shot and ran.”  When asked
about the other two shots, Appellant stated, “I think I hit him once, and I
guess I kept shooting.”  Appellant also stated that he “pulled the
trigger” but that he did not remember how many times.  Appellant explained
that Myers was “just going to beat me up or something and hold me until the
police come.”  Appellant stated, “I told [Myers] I didn’t want to shoot
him when he pushed me on the ground.  I know I tried to talk to the
dude.”  Appellant explained that he was “on too many pills” and that it
“just happened.”  When asked about Myers’s missing wallet, Appellant denied
taking it.  When confronted with evidence that he did, however, he stated
he did not remember taking it.

         
At trial, Appellant’s longtime friend Antonio Smith testified that Appellant
came to his apartment (at the Sun Ridge Apartments near the Best Western) the
morning of the offense.  Appellant was panicky and pacing, had small blood
spots on his shirt, and had a gun in his back pocket.  Appellant tossed a
wallet on the bed containing Myers’s identification, other “cards,” and two
dollars.  Appellant repeatedly stated, “I just shot somebody,” and “The
dude got up and it went wrong.”[2]

         
Shakitha Titus testified that Appellant was a friend and that she picked him up
at the Sun Ridge Apartments the morning of the offense.  Titus drove
Appellant around that day and at one point asked him what happened at the
motel.  Appellant explained that he had been “high” at the time, not in
his right mind, and had gotten scared when the man, who was bigger than he was,
grabbed at him; Appellant thought the man was going to take the gun from
him.  Appellant told Titus, “It was an accident.  It was
self-defense,” and Titus testified that Appellant was very remorseful.

Ashley
Williams testified that she saw Appellant the evening after the offense when
she was standing outside her apartment talking to her friend Briana
Petite.  Appellant walked up, talked to them, and stated he had killed the
man in the motel.  Williams recounted Appellant’s statements that the man
had come up on him like he was going to punch him in the face and that
Appellant had shot him in the neck, head, and chest.  Appellant also
stated he had taken more than one Xanax before the offense and had acted in
self-defense.

Tim Franklin
testified that he had been at Williams’s apartment that evening and had
overheard Appellant talking on a phone.  Franklin
heard Appellant say that he killed “the dude,” that he did not want to do it,
that he watched “the dude die,” and that he had to “get away” because he did
not want anyone to know what he had done.

Kim
Simon, the mother of Appellant’s girlfriend Laquita Reaves (with whom Appellant
had a child), testified that she recognized Appellant from a recording of the
video on the nightly news.  She stated that Appellant came to her home
within a day or two of the offense.  When Appellant watched the video
footage of the offense, he cried and claimed he did not know what
happened.  Simon advised Appellant to turn himself in to authorities but
drove him to the Trinity River so he could “throw away a gun.”  Simon
assumed it was the gun he used at the Best Western, and she saw Appellant throw
the “wrapped up” gun into the water.  Simon did not initially call the
police but eventually showed them the area where she believed Appellant had
thrown the gun.  The gun was never recovered.

         
Tarrant County Deputy Medical Examiner Dr. Lloyd White testified that Myers’s
autopsy revealed three gunshot wounds—one to the upper left front of the neck and
two to the right front chest.  In Dr. White’s opinion, the cause of death
was “penetrating handgun wounds of the chest” (each of which would have been
fatal), and the manner of death was homicide.  Dr. White testified that he
could not determine whether the shooting occurred while Myers was standing,
kneeling, or sitting.  Dr. White testified that the shots were fired from
an “indeterminant” range, meaning “somewhere between contact and typically
around 18 inches or two feet or so,” specifically, “beyond a foot or foot and a
half, particularly for the neck wound.”[3] 
Appellant’s expert estimated that Appellant shot at Myers from a distance of
one to three feet.  The medical examiner’s investigator, Michael Floyd,
testified that the blood scene evidence indicated that Myers had tried to get
to the telephone before he died.

         
Appellant testified that at the time of the offense he was eighteen years old
and made money by selling small quantities of cocaine and marijuana to guests
staying at the Best Western and two other nearby motels.  He explained
that in the hours before the incident, he had been smoking marijuana, drinking
beer, and had ingested eight to nine Xanax[4] and that he “wasn’t sober” and “wasn’t in
[his] right mind.”[5] 
He testified that he had obtained the gun only a few hours before the offense
when a friend asked him to hold his pistol while he made a drug sale. 
When the friend did not return, Appellant left the area with the gun, which was
already loaded.

Appellant
explained that he and Jay Allen initially went into the Best Western to get
change for a hundred dollar bill and encountered Myers, who immediately said he
did not have change and closed the open cash drawer.  Appellant testified
that a couple of hours later he went back to the Best Western alone.  The
following dialogue occurred:  

Q. [Defense
Counsel]:  What was your purpose of going [to the Best Western]?

 

A. [Appellant]: 
To make a drug sale.  Then I – I – I – I – I was fixing to go down the
hallway because I remembered that cash register being open.  I popped all
those pills and I was thinking I got to go in there and go in the cash register
and take all the money out. 

 

                  
. . . . 

 

Q.  When you
went around that corner, did you see Mr. Myers there?

 

                  
A.  No, sir.

 

                  
Q.  So when you did not see him, what was your plan?

 

                  
A.  Jump the counter and get that register open.

 

                  
. . . .

         


Q.  When is the
first he confronted you or you confronted him?

 

A.  I jumped
over the register deal like I thought I was going to do. . . .
I was going through – I had my hand on it and going through it and I was
putting [money] in my pocket.

 

                  
. . . . 

 

And I put it in my
pocket and I heard somebody yell, What the hell are
you doing?  And before I looked back, he hit – hit me and he had some –
and I don’t know – I – I told them it was a three-ring hole
punch, but that was just all I seen was something black.  I don’t
know.    

 

                  
. . . .

 

                  
Q.  [What] [w]as he saying to you? 

 

A.  Yeah. 
First he was like “What the hell are you doing?”  He probably wasn’t going
to kill me, but he said he was . . . . 

 

Q.  What exact
words?

 

A. 
“What the hell are you doing?”  And he hit me with the thing and he
kept asking “What are you doing?”  He said, “I’m going to kill your
ass.”  And he kept asking “What are you doing?  When he – when he
caught me, I just froze.  And when he hit me and stuff, I didn’t know what
to do.  But he kept attacking me so I had to – I had to do that. 

 

Q.  When you
shot, where was the gun?  Where was the gun?  Do you know?

 

A.  It was on my
waist.  He didn’t see the gun.  Otherwise I don’t think he would have
done — if I had the gun out, if I would have robbed him – I could have robbed
him from the other side of the [counter].

 

. . . . 

 

Q.  When you
finally got the gun out, what did you do, [Appellant]?

 

A.  I got it
out, he pushed me.  He – I fell back – back against the – I didn’t fall
back against him, but I felt someone – when he was coming, I dodged. I – I thought he was going to hit me and I dodged.  I
just shot in his vicinity where he was. 

 

. . . I thought I shot him once.

 

[Emphasis
added.]  

The trial court’s charge instructed the jury to determine, in
turn, whether Appellant was guilty of capital murder, felony murder, simple
murder, or not guilty.  See Tex. Penal Code Ann. '' 19.02(b)(1)–(3)
(West 2011), 19.03(a)(2).  Appellant’s theory of defense in his testimony
and his counsel’s closing argument was that he did not possess the requisite
intent to murder Myers and that he was, at most, guilty of the lesser-included
offense of felony murder.  The jury found Appellant guilty of capital
murder.  The charge instructed the jury that voluntary intoxication does
not constitute a defense to the commission of a crime.  See id. ' 8.04
(West 2011).

B. 
Applicable Law

As
relevant in this case, a person commits capital murder if he intentionally
commits murder in the course of committing or attempting to commit robbery.[6]  See id. ' 19.03(a)(2).  A person
commits robbery if, in the course of committing theft, he intentionally or
knowingly causes bodily injury to another.  See id. ' 29.02(a) (West 2011).  The
State must prove a nexus between the murder and the theft, i.e., that the
murder was committed to facilitate the taking of the property.  Cooper
v. State, 67 S.W.3d 221, 223 (Tex. Crim. App. 2002); Ibanez v. State,
749 S.W.2d 804, 807 (Tex. Crim. App. 1986).

“A
person acts intentionally . . . with respect . . . to a result of his conduct
when it is his conscious objective or desire to . . . cause the result.”  Tex. Penal Code Ann. ' 6.03 (West 2011). 
Intent is a fact question for the jury, and it is almost always proven by
circumstantial evidence.  See Hart v. State, 89 S.W.3d 61,
64 (Tex. Crim. App. 2002); see also Gardner v. State, 306 S.W.3d
274, 285 (Tex. Crim. App. 2009), cert. denied, 131 S. Ct. 103
(2010).  A jury may infer intent from any facts that prove its existence,
including acts, words, and conduct of the accused; method of committing the
crime; and the nature of wounds inflicted on victims.  See Hart,
89 S.W.3d at 64; Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App.
2001); Sholars v. State, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st
Dist.] 2009, pet. ref’d), cert. denied, 131 S. Ct. 156 (2010).  A
jury may infer intent to kill from the use of a deadly weapon in a deadly
manner.  See Brown v. State, 122 S.W.3d 794, 800 (Tex. Crim.
App. 2003), cert. denied, 541 U.S. 938 (2004); see also Ex
parte Thompson, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (“It is
both a common-sense inference and an appellate presumption that a person
intends the natural consequences of his acts, and that the act of pointing a
loaded gun at someone and shooting it toward that person at close range
demonstrates an intent to kill.” (internal
citations omitted)).  In the case of a capital murder committed in the
course of a robbery, there is no requirement that the intent to cause death be
premeditated or formulated prior to the commission of the robbery.  See
Rousseau v. State, 855 S.W.2d 666, 674 (Tex. Crim. App.), cert.
denied, 510 U.S. 919 (1993).  Rather, the intent to cause death must
only have been formulated when the actor commits the murder.  See id.


C. 
Standard of Review

In
our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.[7]  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see Adames v. State,
353 S.W.3d 854, 859 (Tex. Crim. App. 2011), cert. denied, 80 U.S.L.W.
3462 (U.S. Mar. 19, 2012) (No. 11-944).____S. Ct. ____ (2012).  We defer
to the jury’s determinations of credibility and may not substitute our judgment
for that of the factfinder.  See Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We
“determine whether the necessary inferences are reasonable based upon the
combined and cumulative force of all the evidence when viewed in the light most
favorable to the verdict.”  Hooper v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  When the
record supports conflicting inferences, we presume that the factfinder resolved
the conflicts in favor of the prosecution and therefore defer to that
determination.  Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).

D. 
Analysis

         
Appellant
contends that his intent was to commit theft and that he shot Myers “not with
the intent to murder [him], but out of fear because Myers was attacking him
with weapons.”  In support, he points to his own testimony and statements
and some of the physical evidence.[8]

Even if Appellant’s main objective was to steal money, such
an objective does not foreclose a finding that he later formed the intent to
kill Myers.  See Robertson v. State, 871 S.W.2d 701, 706–07
(Tex. Crim. App. 1993), cert. denied, 513 U.S. 853 (1994) (holding that
appellant’s claim that he returned to house solely to steal drugs did not
constitute evidence that he could not have formulated an intent to kill between
returning to the house and shooting the victim); Rousseau, 855 S.W.2d at
674; see also Threadgill v. State, 146 S.W.3d 654, 664–65 (Tex.
Crim. App. 2004) (noting that, although the defendant’s main objective was to
steal the car, this did not foreclose a finding that he intentionally killed
the victim when he shot at him at close range in the back of the car); Gonzalez
v. State, 296 S.W.3d 620, 626–27 (Tex. App.—El Paso 2009, pet. ref’d)
(“While the [video]tape may show a possibility at some point during the robbery
that A.C. did not intend to kill Potts, it does not amount to evidence that
A.C. did not intend to cause his death at the time of the shooting.”).

The
evidence demonstrated that Appellant entered the motel with a loaded gun and
that he pulled the trigger three times, fatally shooting Myers twice in the
chest.  Additionally, Appellant admitted to Detective Serra during his
second interview, “I think I hit him once, and I guess I kept shooting,” and “I
pulled the trigger; I don’t remember how many times.”  Indeed, Appellant
made several admissions that belie his claims that he did not have the intent
to kill Myers, including that he “tried to talk” to Myers, that he told Myers
he did not want to shoot him, and that he “had to do that” because Myers kept
attacking him.[9] 
Appellant also stated that he thought Myers was going to beat him up and call
the police; there was also evidence that Myers was trying to reach the
telephone when Appellant shot him, which the jury could have reasonably
inferred that Appellant’s actions were intentional and not merely done as a
reflex or in fear.  Appellant then fled the scene and did not call
911.  The jury could have rationally determined beyond a reasonable doubt
that Appellant intentionally caused Myers’s death.  See Ex parte
Thompson, 179 S.W.3d at 556; see also Gonzalez, 296 S.W.3d at 626–27
(“The fact that A.C. shot Potts in the chest with a .22 and fled the scene with
Appellant reinforces the notion that there was intent to kill.”); Motilla v.
State, 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) (indicating that decision
to fire more than once is evidence of intent to kill).[10]

Appellant
refers us to two cases.  See Robertson, 871
S.W.2d at 705; Ibanez, 749 S.W.2d at 807.  In both Robertson
and Ibanez, the defendants admitted intentionally killing their
victims but maintained they were not guilty of capital murder because the
property they stole was an afterthought.  Here, Appellant maintains he did
not intentionally kill Myers but admits he intended to steal money. 
Indeed, there is evidence that Appellant formed the intent to obtain or
maintain control of the victim’s property either before or during the commission
of the murder.  See Conner, 67 S.W.3d at 197 (“If there is
evidence . . . from which the jury could rationally conclude beyond a
reasonable doubt that the defendant formed the intent to obtain or maintain
control of the victim’s property either before or during the commission of the
murder, then the State has proven that the murder occurred in the course of the
robbery.”).

Applying
the Jackson criteria to the facts of this case, we hold that a rational
trier of fact could have found beyond a reasonable doubt that Appellant
committed capital murder.

IV.  Conclusion

         
Having
overruled Appellant’s sole issue, we affirm the trial court’s judgment.

 

ANNE GARDNER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  March 22,
2012














[1]See
Tex. R. App. P. 47.4.





[2]A
maintenance man at the Sun Ridge Apartments found the wallet in the trash can
and turned it in to his manager, who turned it in to the authorities.





[3]He
explained that if the weapon had been available to test fire, an evaluation
concerning any powder residue on the clothing could have yielded a more precise
distance.





[4]Forensic
toxicology consultant Dwayne Fuller testified on Appellant’s behalf.  He
explained that Xanax is an anti-anxiety medication that is sometimes used to
treat depression and that it can cause loss of memory; the higher the dose, the
stronger the effects.  Fuller testified that the person would have
“trouble storing the memories . . . of the events . . . taking place . . . at
the time [he or she was] under the influence of this drug.”





[5]When
the prosecutor stated on cross-examination, “You look mighty agile for somebody
who’s that drunk,” Appellant responded, “I have a high tolerance for the
pills.  I been popping pills for a long amount of time and they don’t—they
don’t just do me like they’ll do somebody the first time who pop them.”





[6]Capital
murder requires an intent to kill.  See id. ' 19.03(a)(2).  In comparison, “felony murder” is
an unintentional murder committed in the course of committing a felony.  Id.
' 19.02(b)(3); Fuentes v. State, 991 S.W.2d 267, 272 (Tex.
Crim. App., cert. denied, 528 U.S. 1026 (1999).  Noncapital murder
includes intentionally or knowingly causing an individual’s death or intending
to cause serious bodily injury and committing an act clearly dangerous to human
life that causes an individual’s death.  Tex. Penal Code Ann. ' 19.02(b)(1),
(2).





[7]Because
the court of criminal appeals has eliminated the factual sufficiency standard
of review from this state’s criminal jurisprudence, Brooks v. State, 323
S.W.3d 893, 912 (Tex. Crim. App. 2010), we determine only whether the evidence
is sufficient to support the jury’s verdict.





[8]For
instance, Appellant elicited from Detective Serra that the physical evidence
was consistent with Appellant’s story that Myers was not near the cash register
when Appellant first jumped over the counter and that Myers came at him with a
three-hole punch.  He also relies on Detective Serra’s “admissions” on
cross-examination that it was logical to assume that no one was standing behind
the counter when Appellant jumped over it, that Myers was much larger than
Appellant, that Appellant shot him because he was “mad” and going to “whoop” him, and that Appellant claimed his eyes were closed when he
fired.





[9]In
addition to these incriminating admissions, the jury could have considered that
Appellant gave several differing explanations for his actions, including that
he found Myers already shot and dying, that he shot Myers by accident, that he
shot Myers because he “got up,” that he shot Myers in self-defense, and that he
shot in the vicinity of Myers with his eyes closed.  See generally Guevara
v. State, 235 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that
inconsistent statements and implausible explanations are also probative of
wrongful conduct and are circumstances of guilt).





[10]See
also Goad v. State, 354 S.W.3d 443, 455 (Tex. Crim. App. 2011) (“If a
record contains only circumstantial evidence of deliberate conduct, such as
evidence that a victim was shot repeatedly, the State may properly rely on that
evidence to establish that the defendant’s acts were intentional.”) (Alcala, J., concurring).