

NUMBERS 13-12-00148-CR & 13-12-00155-CR & 13-12-00439-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOSE HOMERO SOSA CANTU                                    Appellant,

v.

THE STATE OF TEXAS,                                      Appellee.

### On appeal from the 430th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Benavides

In these consolidated appeals, appellant Jose Homero Sosa Cantu appeals three related convictions. In appellate cause number 13-12-00148-CR, Sosa appeals his conviction for the murder of Gilberto Rosales Aguilar, arguing: (1) that the evidence was legally insufficient to support the conviction and (2) that he received ineffective

assistance of counsel. *See* TEX. PENAL CODE ANN. § 19.02 (West, Westlaw through 2013 3d C.S.). In appellate cause number 13-12-00439-CR, Sosa challenges the sufficiency of the evidence supporting his conviction for the murder of Roberto Javier Resendez. *See id.* And finally, in appellate cause number 13-12-00155-CR, concerning Sosa's conviction for possession of marihuana, he contends that: (1) the use of a drug-sniffing dog at his home constituted an unreasonable search under the Fourth Amendment; (2) he did not receive a *Miranda* warning before confessing to having marihuana in his home; and (3) he received ineffective assistance of counsel. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (West, Westlaw through 2013 3d C.S.); *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm all three convictions.

## I. BACKGROUND

### A. Cause Number 13-12-00148-CR: The Murder of Gilberto Rosales Aguilar

On February 6, 2010, City of Mission police officers found the body of Gilberto Rosales Aguilar, also known as "El Gavilan,"[1] in a field in northwest Hidalgo County. Aguilar, whose t-shirt had been pulled up to expose his chest, had a gunshot wound to the head. His body was wrapped in duct tape from his mouth to his neck and from his waist to his ankles. The word "rata"[2] had been written on his neck, and his ears had been cut or clipped. A .45 caliber shell casing was found at the scene. Aguilar was identified by his fingerprints, which were in the Hidalgo County Sheriff's Office database due to his past criminal history.

### 1. Testimony of Investigator Fernando Tanguma

---

[1] The Spanish word "gavilan" translates into "sparrow."

[2] Later, Investigator Fernando Tanguma explained that this Spanish word translates literally into the word "rat," but can also mean "a thief," "a snitch," or "someone who cannot be trusted."

At trial, Hidalgo County Sheriff's Investigator Fernando Tanguma explained his investigation of Aguilar's death and how the investigation eventually led to the arrest of Sosa. Investigator Tanguma testified that when he took over the investigation, he learned that Aguilar had been dealing drugs. He spoke to Daniel Gutierrez, also known as "Danny Boy," who was apparently the last person to see Aguilar alive. Gutierrez told Investigator Tanguma about Johnny Garcia, who was Aguilar's friend. Garcia used to date Erica Yvette Obregon Sosa, Sosa's daughter. Gutierrez told Investigator Tanguma that Garcia was involved in a recent shooting that occurred in McAllen, Texas. Upon further inquiry, Investigator Tanguma learned that the McAllen shooting also involved .45 shell casings. Forensic analysis revealed that the casings from the scene of Aguilar's death and the McAllen shooting came from the same gun. Investigator Tanguma also learned that a white four-door pickup was used in the McAllen shooting.

When Investigator Tanguma went to Erica's home to speak with her about her ex-boyfriend Garcia, he met the appellant for the first time. Sosa introduced himself as "El Licensiado."[3] Investigator Tanguma asked Erica and Sosa if they had ever owned a white four-door pickup. Erica admitted that she used to own a truck like that and she had let her ex-boyfriend, Garcia, drive it for three to four months while they were still together. She, however, had since sold the vehicle. Investigator Tanguma thought this sale was suspicious, though, because the bill of sale did not show who purchased the vehicle.

Investigator Tanguma then testified that he received a call from Texas Ranger Melba Molina. Ranger Molina learned that Hector Gonzalez, who was in the custody of

---

[3] The Spanish word "licensiado" translates into the word "attorney" in English.

3

the U.S. Department of Homeland Security—Immigration and Customs Enforcement Division, had information about a murder that occurred in Mission, Texas. Investigator Tanguma went to speak with Gonzalez. Gonzalez told Investigator Tanguma that Gutierrez and another man, Mark Anthony Garza, were involved in drug trafficking and in Aguilar's murder. Gonzalez also stated that Gutierrez had recently been arrested driving a 1997 maroon GMC Yukon in Falfurrias, Texas and that the vehicle had been impounded. Gonzalez told Investigator Tanguma that he had also been to Sosa's house once with Gutierrez and that while he was there, Sosa asked for the day's newspaper. After perusing the newspaper, Sosa allegedly stated that the police "did not have anything or any suspects," that "that's what happens to thieves," and that they should have written "rata" on the deceased person's forehead instead of his neck.

Gonzalez then told Investigator Tanguma that he had recently taken possession of a handgun from Gutierrez. Gonzalez sold it to his girlfriend's father, Juan Tapia. Investigator Tanguma obtained consent from Tapia to take the gun, which was a .25 caliber semi-automatic handgun with white grips, and logged it into evidence.

Investigator Tanguma then spoke with Aida and Juan Villarreal, who found Aguilar's body the night of the murder and reported it to law enforcement authorities. Aida said her daughter recalled seeing "GMC" on the front grill of an SUV leaving the scene of the crime; Aida recalled that it was a dark-colored SUV.

Investigator Tanguma then spoke with Mark Anthony Garza, as Gonzalez had mentioned his name during his interrogation. Garza admitted that he knew Gonzalez, Gutierrez, Erica, and Sosa. Garza also mentioned that he knew a "Gordo One," "Gordo Two," and Luis Marroquin who lived at the Sosa household.

4

Luis Adan Aleman Marroquin, also known as "Wicho," was eventually brought into custody. Marroquin explained that he was from Mexico and had gone to work for Sosa when he came to the United States. Marroquin handled animals, cleaned cars, and did chores for the Sosa family. Marroquin told Investigator Tanguma that he, "Gordo One," "Gordo Two," and Roberto Javier Resendez all worked for the Sosa family and lived at their residence. Marroquin stated that, one day, Gutierrez and Garza arrived at the Sosa home and Gutierrez showed Sosa his new gun. Sosa informed Gutierrez that the gun was actually his—Sosa's gun had been missing—and asked Gutierrez where he got the gun. Gutierrez told Sosa that he had gotten the gun from Aguilar. Sosa remembered that Aguilar had been to his home several times on drug-related business with Erica's ex-boyfriend, Garcia. Sosa asked Gutierrez and Garza to bring Aguilar to his home.

Marroquin stated that Gutierrez and Garza brought Aguilar to the home in a maroon Yukon SUV. Aguilar's head was bleeding when he arrived, and his hands were tied behind his back. Aguilar was taken to the garage. Marroquin told Investigator Tanguma that Sosa ordered Gordo One and Gordo Two to wrap Aguilar's head with gray duct tape so that he would not bleed in the garage. Sosa questioned Aguilar about Gutierrez's gun, some marihuana that had recently been stolen from him, and also a recent attempt to kidnap Erica's young son. Sosa also wanted to know if Garcia, Erica's ex-boyfriend, was involved in any of these occurrences. Throughout this questioning, Gordo One and Gordo Two beat Aguilar. Although Aguilar initially denied everything, he eventually admitted that he and Garcia stole the marihuana and that it was Garcia's idea to kidnap Erica's son.

5

Marroquin told Investigator Tanguma that when Erica learned that Aguilar and Garcia were behind the kidnapping attempt of her son, she retrieved a large pan from the kitchen and hit Aguilar on the head with it.   Sosa ordered Gordo One and Gordo Two to wrap Aguilar up with duct tape.   He was then taken to the GMC Yukon.   According to Marroquin, Sosa gave orders to shoot Aguilar twice in the head and Resendez volunteered to do so.   Marroquin saw Sosa give Resendez a black .45 caliber handgun. Marroquin then witnessed Resendez write "por rata" on the left side of Aguilar's head. According to Investigator Tanguma, "rata" means "a thief," "a snitch," or "someone who cannot be trusted."   Marroquin stated that when everyone returned, they all burned their clothes and cleaned the GMC Yukon.

Based on this information, Investigator Tanguma obtained a felony arrest warrant to bring Sosa into custody.   He did not execute the warrant, but rather had Lieutenant Esteban "Steve" Herrera do so.[4]   Law enforcement officials then arrested Sosa and brought him to the Hidalgo County Sheriff's Department.

### 2. Sosa's Statement

Investigator Tanguma testified that, prior to taking Sosa's statement, Sosa was given written and verbal *Miranda* warnings in English and Spanish.   The written Spanish warnings are in the appellate record and show that Sosa initialed and signed his name where appropriate.

The relevant portions of Sosa's statement follow:

I would like to say that my daughter Erica used to date a man by the name of Johnny Garcia for about 3 or 4 months.   I believe Erica started dating Johnny the last month of December 2009.   Everything was okay with

---

[4] See the discussion at section I(C), *infra*, for a full account of Sosa's arrest.

Erica and [Garcia] until Erica's birthday on January 15, 2010.   Erica broke up with [Garcia] and he was very upset.

[Garcia] had introduced me to two people by the names of Saul Casas and Oscar Cantu several months before Erica started dating him.   Saul and Oscar ended up living in my house for about a year.   I gave Saul the nick name of Gordo-1 and Oscar the nick name of Gordo-2.

In the month of January 2010 my friend Angie introduced me to "Wicho", [Marroquin] and Roberto [Resendez].   [Marroquin] started working at my house cleaning the yard.

I would like to say that sometime in the month of February 2010 I started looking for my .25 caliber semi-auto handgun in my garage.   I had [Marroquin] and [Resendez] looking for my gun but we never found [it].

On the same month a person by the name of Mark Anthony Garza started dating my daughter Erica Yvette Sosa.   [Garza] was always with his friend [Gutierrez].   One time [Garza] and [Gutierrez] came by my house and [Gutierrez] showed me a .25 caliber chrome handgun with bone color handgrips.   I saw the gun and recognized it right away.   I asked [Gutierrez] where he got the gun from.   [Gutierrez] told me he got it from a friend of his.   I checked out the gun very carefully and noticed it was the gun that I had lost several weeks ago.   I asked [Gutierrez] what was the name of his friend he bought the gun from.   [Gutierrez] told me that he got the gun from his friend [Aguilar].   [Aguilar] was introduced to me by [Garcia] when he was dating Erica.   [Aguilar] came to my house several times with [Garcia].   I told [Gutierrez] that the gun belonged to me. [Gutierrez] told me to keep the gun and I told him to keep it.

I was told [b]y [Gutierrez] and [Garza] that they would get [Aguilar] and bring him to my house.   [Garza] and [Gutierrez] were in a 1997 or 1998 green SUV.   Several hours later [Garza] and [Gutierrez] returned to my house and parked their truck in the back yard of my house.   I noticed that [Garza] and [Gutierrez] had a male subject in the back seat of the SUV.   I saw the subject was [Aguilar] who had his hands tied with gray tape.   I saw [Garza] and [Gutierrez] take [Aguilar] out of the truck and walked him to the garage.   I saw that [Aguilar] was bleeding from his mouth when [Garza] and [Gutierrez] brought him inside the house.

I also saw Gordo-[]1[,] Gordo-2, [Marroquin], and [Resendez] enter the garage.   I walked inside the garage and noticed Gordo-1, Gordo-2, [Marroquin] and [Resendez] punching and hitting [Aguilar] on his head and body.   When I saw them hitting [Aguilar], I decided to walk out of the garage.   I heard [Garza] yelling at [Aguilar] and asking him who had stolen the gun and who wanted to kidnap Erica's son, Angelito.   I heard [Aguilar]

7

say that he stole the .25 caliber handgun and the person who wanted to kidnap Angelito was [Garcia].

I walked back inside the garage and noticed Gordo-1 and [Marroquin] were using gray tape to tape [Aguilar's] face, hands and feet. I saw [Gutierrez], [Garza], and Gordo-1 picked up [Aguilar] from the floor and place him in the back of green SUV. [Aguilar] was not moving or making any noise.

I decided to give [Garza] 2 handguns that I owned. The guns were .45 calibers semi-auto handguns, one was chrome and the second gun was black. I told [Garza] that I did not want the guns in my house because of my grandchildren.

[Marroquin], [Gutierrez], [Garza], Gordo-1, and [Resendez] left in the green SUV. I was not told where they were getting rid of the [Aguilar] body. I stayed at home and about 1 ½-2 hours later [Garza], [Gutierrez], Gordo-1, [Resendez], and [Marroquin] returned home. I was told by [Garza] that [Resendez] had shot [Aguilar] in the head.

### 3. Testimony of Hector Gonzalez

Gonzalez testified at trial and confirmed most of what Investigator Tanguma had already described to the jury. He stated that he had known Garza since high school and had met Garza's friend, Gutierrez, in January of 2010. He knew that Garza and Gutierrez were involved in drug trafficking. He confirmed that Garza dated Erica Sosa at one point and that one time he went to her house and met Erica's father "El Licensiado," or Sosa. Gonzalez confirmed that Sosa had several men working for him and living at his residence, including Marroquin and Gordo One.

Gonzalez testified that one morning he was with Garza when Garza received a call to pick up the day's newspaper. They then took the newspaper to Sosa's residence. Gonzalez noticed an article in the day's paper about a murder in the "woods" or "brush." He noticed that others in the house read the same story. He testified that Sosa had asked if there was any evidence against him, and what the officers had found, if anything. He also heard Sosa use the term "por rata" about the

8

person who had been killed, and that Sosa quipped, "that's just what he deserves for stealing."

### 4. Testimony of Mark Garza

Garza testified that he had been charged with the capital murder of Aguilar, had entered into an agreement to plead guilty to the charge of aggravated kidnapping instead, and received a twenty-five year sentence in exchange for his testimony against Sosa. He testified that he and his friend Gutierrez were in the business of transporting drugs. He stated that he knew Erica Sosa and had met her father, Sosa, who was also known as "El Licensiado." He stated that he and Erica were just friends. He admitted that Sosa told him at one point that Garcia, Erica's ex-boyfriend, had once stolen marihuana from him.

Garza testified that, besides Erica, her mother, and Sosa, he knew of four other men who lived at the Sosa residence—"Gordo One," "Gordo Two," Marroquin, and Resendez. He testified that one day his friend Gutierrez had purchased a gun from Aguilar and paid $150 for it. On the day Gutierrez purchased the gun, they went to Sosa's house. Garza testified that when Gutierrez showed Sosa the gun, Sosa looked surprised and told Gutierrez that it was actually his gun that had been stolen recently. When Gutierrez stated that he had purchased it from Aguilar, Garza stated that Sosa looked angry. Gutierrez and Garza then went to bring Aguilar to Sosa's home. Garza stated that he waited in the car while Gutierrez went to retrieve Aguilar from where he was staying. He reported that Aguilar came to the car bleeding from his head because he and Gutierrez fought; Aguilar had not wanted to accompany them.

9

Garza testified that when they arrived at the Sosa house with Aguilar, that Gordo Two put handcuffs on Aguilar and took him to the garage. Garza stayed in the kitchen with Gutierrez, but later went to the garage where he saw Resendez cut Aguilar's ears with a pair of scissors. He also saw Gordo[5] kick Aguilar in the ribs and witnessed Erica hit Aguilar over the head with a kitchen pan. Aguilar's body was then loaded into the Yukon. Garza then testified that he, Gutierrez, and Gordo One got into a white Xterra, while Resendez, Marroquin, and Gordo Two got into the Yukon. He testified that they drove "to 107 towards Western and Texas road." He heard two to three gun shots. Later, he learned that Resendez had shot Aguilar.

Garza testified that, the next day, he and Gonzalez took a newspaper to Sosa's house. He heard Sosa say, "that's what happens to people that steal from me" and make a comment about rats. Sosa also stated that Aguilar had stolen merchandise and a gun from him.

### 5. Testimony of Luis "Wicho" Marroquin

Marroquin testified that, although he had been charged with capital murder of Aguilar, he entered into a plea agreement to plead guilty to murder and received a twenty-five year prison sentence in exchange for testifying truthfully at trial. Marroquin testified that he lived with Sosa, Sosa's wife, Erica and her children, Gordo One, Gordo Two, and Resendez at Sosa's home. He knew Garza and Gutierrez and Erica's ex-boyfriend Garcia.

Marroquin described what happened the day Gutierrez showed Sosa his new gun. He stated that when Sosa realized that the gun was one that had been stolen from

---

[5] The record is not clear whether Gordo One or Two committed this act.

him, he ordered Gutierrez and Garza to bring Aguilar to the house. Marroquin reported that when Aguilar arrived, he was injured on the mouth because he had been beaten so that they could kidnap him. Marroquin testified that Aguilar was questioned in the garage about the stolen gun. During the questioning, Resendez hit Aguilar with a pipe, Erica hit Aguilar on the head with a frying pan, and Gordo Two punched Aguilar in the abdomen. Marroquin also witnessed Resendez cut Aguilar's ears. Marroquin stated that, after the beating, Aguilar seemed to be immobile. Marroquin testified that Sosa ordered him to wrap up Aguilar with duct tape. Marroquin taped Aguilar's body from his abdomen up to his head, while Gordo Two taped Aguilar's legs. Sosa then ordered Marroquin to take Aguilar to the maroon Yukon and asked for volunteers to kill Aguilar. Resendez offered to shoot him. Marroquin stated that Sosa gave Resendez a gun and ordered him to shoot Aguilar twice in the head.

Marroquin testified that he did not go with the rest of the men to shoot Aguilar and dump his body. He did testify, though, that Gordo Two cleaned the maroon Yukon the next day and that all of the men burned their clothes from the day before because they had blood on them.

**B.      Cause Number 13-12-00439-CR:   The Murder of Roberto Javier Resendez**

Marroquin testified that, after Aguilar was murdered, Sosa refused to let him, Gordo One, Gordo Two, or Resendez leave the house because he feared one of them would talk about the circumstances surrounding Aguilar's death. Their living situation "was more tense." Marroquin stated that Resendez admitted to murdering Aguilar, and that Sosa promised to pay Resendez $20,000 to kill Aguilar. However, when Sosa failed to pay Resendez, Resendez became "upset . . . he wanted his money."

11

Resendez apparently threatened to cut off the fingers of Sosa's family members if Sosa did not pay him.

Marroquin then stated that Sosa confessed to wanting to "get rid of," or kill, Resendez because he was afraid that Resendez would talk about Aguilar's murder. Marroquin confessed that Gordo One and Gordo Two then told him that they were going to take Resendez back to where the animals were on Sosa's property, kill him, and bury him in a hole they dug inside the chicken coop for this purpose. Marroquin stated that Garza and Gutierrez also participated in Resendez's murder by purchasing "some materials so the body wouldn't smell, and also cement to put in the hole." Marroquin testified that Sosa gave Gordo One and Gordo Two each an ice pick to stab Resendez to death. Later, Marroquin saw Resendez's body covered with holes, lying dead in a grave dug inside the chicken coop. He also learned that Resendez's throat had been slit with a saw, but he did not know who had done that. Gutierrez and Garza later came to cover the body with lye and cement.

When Sosa was brought into custody and questioned by Investigator Tanguma, he also mentioned the death of Resendez. Sosa provided the following relevant information in his statement:

> I would like to add that about three weeks after Aguilar's death, [Resendez] was upset at me because I had not paid him for a job he had done for me. I told [Resendez] that I had not gotten paid for the marihuana but would pay him the minute I had money.
>
> Gordo-1 and Marroquin told [Resendez] to calm down but he was very upset. I saw Gordo-1 walk to the back room that is located behind the chicken coop. I saw that Gordo-1 had an ice pick in his right hand. I told Gordo to calm down because they all worked together. I then walked inside my house and [Resendez], Gordo and [Marroquin] stayed outside. I did not go outside anymore. I noticed after that day I did not see [Resendez] anymore. Several days later I was told by Gordo-1 that

12

Marroquin and him had stabbed [Resendez] with [an] ice pick then they buried him in the chicken coop in the back yard. I told Gordo-1 and [Marroquin] that was the wrong thing to do.

## C.    Cause Number 13-12-00155-CR:    Confiscation of the Drugs

As stated before, Investigator Tanguma obtained a felony arrest warrant for Sosa after he questioned Marroquin and realized that Sosa was involved in Aguilar's murder. Although Investigator Tanguma obtained the warrant, Lieutenant Steve Herrera executed it. Lieutenant Herrera testified that he was briefed regarding the ongoing investigations. He stated that he and fellow officers then got a cellular telephone number for Sosa and got a "ping" on Sosa's location.

Lieutenant Herrera, along with the sheriff's tactical patrol unit, travelled to the residence where the "ping" originated. He testified that he and his fellow officers set up a perimeter around the residence, as per protocol, and that he then knocked on the door. Sosa answered the door. Lieutenant Herrera spoke with Sosa and took him into custody. Lieutenant Herrera then testified that the tactical team entered the residence to secure the officers' safety. Officers "make sure that there is not any potential danger inside of the house before [they] walk away…." The officers evacuated two women and two young children.

At some point, K-9 Officer Jaime Garcia, who was at the scene with his trained narcotics dog Bosco, informed Lieutenant Herrera that Bosco had alerted him to the presence of narcotics. Another officer, Senior Deputy John Ortega, told Lieutenant Herrera that he noticed narcotics in the home while he secured the premises. Deputy Ortega saw large bundles of marihuana in one room during the protective sweep and also detected the smell of marihuana.

13

Deputy Cavazos testified that Sosa gave him verbal consent to search for narcotics in the home, but that Lieutenant Herrera decided to inform the narcotics unit about the drugs instead. Lieutenant Herrera explained that he made this decision because his officers "were there to serve a felony arrest warrant" and not to "seize mari[h]uana." Lieutenant Herrera advised the sheriff's department narcotics unit about the potential find and they came later with a warrant to seize the narcotics.

Deputy Cavazos also testified that he did not give Sosa a *Miranda* warning prior to asking Sosa if he was aware of the presence of marihuana in the house. Sosa responded in the affirmative and also informed Cavazos that there were more drugs in the bathroom. Deputy Cavazos stated that the narcotics investigators found a total of 460 pounds of marihuana in a bedroom and bathroom. They also found a hydraulic press to compress marihuana; clear tape, Reynolds wrap, and cellophane, which are used to package marihuana; weapons, including a hunting rifle, a .270 rifle, "an A.K. with a long magazine," a shotgun, and several handguns; and a bullet proof vest.

## II. CAUSE NUMBER 13-12-00148-CR

In Cause Number 13-12-00148, Sosa was convicted of the murder of Gilberto Rosales Aguilar".[6] By two issues, which we renumber as three, he argues: (1) that co-conspirator testimony should not have been used to convict him; (2) that the evidence was insufficient to establish the requisite mens rea to support a murder conviction; and

---

[6] In the original indictment, Sosa was charged with capital murder because of the kidnapping of Aguilar prior to Aguilar's execution. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West, Westlaw through 2013 3d C.S.) (stating that a person commits capital murder if the person commits murder in the course of committing or attempting to commit kidnapping). However, in this case, the jury ultimately convicted Sosa of the lesser-included charge of murder. *See id.* § 19.02(b)(1) (West, Westlaw through 2013 3d C.S.). The trial court sentenced Sosa to forty-five years in the Texas Department of Criminal Justice–Institutional Division.

(3) that he received ineffective assistance of counsel.

## A. Co-conspirator Testimony

In his first issue, Sosa challenges the State's use of the co-conspirator testimony of Garza and Marroquin to convict him.

### 1. Applicable Law

A person cannot be convicted based upon the testimony of an accomplice witness unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. TEX CODE CRIM. PROC. ANN. art. 38.14 (West, Westlaw 2013 through 3d C.S.). Corroborating evidence can be direct or circumstantial and does not have to establish the guilt of the accused. *Smith v. State,* 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) ("The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense."); *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App. 1984) (en banc). The corroborating evidence must merely tend to connect the accused to the commission of the offense. *Smith,* 332 S.W.3d at 442. In reviewing a complaint of insufficient corroborating evidence, we are required "to consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id.*

### 2. Discussion

Here, even if we completely disregard the testimony of Garza and Marroquin, both of whom were charged as co-conspirators, there is evidence tending to connect Sosa with Aguilar's murder. Gonzalez, who was not a co-conspirator, testified that he went to

Sosa's house the day after Aguilar was killed. Gonzalez noticed Sosa read an article in the day's newspaper regarding a murder in the "woods" or "brush." He stated that Sosa had asked the others in the room if there was any evidence against him and what the officers had found, if anything. He also heard Sosa use the term "por rata" about the person who had been killed and explain, "that's just what he deserves for stealing." Investigator Tanguma testified that Aguilar had the word "rata" written on his neck.

Further, Sosa's own statement to the police corroborates many of the findings that Investigator Tanguma confirmed through other witnesses. Although Sosa minimizes his involvement in Aguilar's death, he confirmed that Gutierrez showed him a gun that he believed Aguilar had stolen from his home weeks before. He also confirmed that Gutierrez and Garza brought Aguilar to his home, and that Aguilar was questioned and beaten in his garage by Gordo One, Gordo Two, Marroquin, and Resendez. He even admitted giving Garza a gun: "the guns were .45 calibers semi-auto handguns, one was chrome and the second gun was black." This combined corroborating evidence tends to connect Sosa to the commission of the offense. *Smith,* 332 S.W.3d at 442. Accordingly, we overrule this issue.

## B. Sufficiency of the Evidence[7]

In his second issue, Sosa argued that there was not enough evidence to establish that he had the requisite mens rea to commit murder.

### 1. Applicable Law

---

[7] Sosa contested both the legal and the factual sufficiency of the evidence to support his murder conviction. In 2010, however, the Texas Court of Criminal Appeals held that there is no "meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt". *Brooks v. State*, 323 S.W.3d 893, 902–03 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we consolidate Sosa's two points of error on sufficiency into one analysis.

16

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State,* 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)); *see Brooks v. State,* 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State,* 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State,* 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* A person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PEN. CODE ANN. § 19.02(b)(1).

Here, Sosa was charged under the law of the parties, which provides as follows:

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to

17

an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with the commission of the offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

*See id.* §§ 7.01(a)–(b), 7.02(a)(2) (West, Westlaw through 2013 3d C.S.). "Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

## 2. Discussion

Sosa contends that the State did not prove the culpable mental state of "knowingly" or "intentionally" to support his murder conviction. "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." TEX. PENAL CODE ANN. § 6.03(b) (West, Westlaw 2013 through 3d C.S.). A person acts "intentionally" "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West, Westlaw 2013 through 3d C.S.).

"Section 7.02(b) allows criminal responsibility for the conduct of another, eliminating the necessity for proof of intent to commit the felony actually committed, but it does not excuse the State from proving a culpable mental state." *Gonzalez v. State*, 296 S.W.3d 620, 630 (Tex. App.—El Paso 2009, no pet.) (citing *Gravis v. State,* 982 S.W.2d 933, 938 (Tex. App.—Austin 1998, pet. ref'd)). "The State is required to show that the accused had both the mens rea to engage in the conspiracy and the culpable mental state to commit the underlying, i.e., the intended, felony." *Id.* "The mental state

for the underlying felony supplies the mens rea for the felony actually committed by the co-conspirator." *Id.*

Under the law of the parties, Sosa "solicit[ed]," "encourage[d]," and "direct[ed]" the murder of Aguilar. Marroquin testified that, after Aguilar was beaten for stealing Sosa's gun, Sosa ordered Marroquin to wrap Aguilar with duct tape and carry him to the maroon Yukon. Marroquin also stated that Sosa then asked for volunteers to kill Aguilar, and that Resendez voluntarily offered to do so.

Garza testified that Sosa became angry when he realized that Aguilar had stolen a gun from him and subsequently gave it to Gutierrez. Garza also testified that, the day after Aguilar's murder, he and Gonzalez took a newspaper to Sosa's house. He heard Sosa say, "that's what happens to people that steal from me" and make a comment about rats. Garza also testified that Sosa said Aguilar had stolen merchandise and a gun from him, which would constitute a possible motive for Sosa to order Aguilar's death.

Viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found beyond a reasonable doubt that Resendez intentionally or knowingly killed Aguilar and that Sosa solicited, encouraged, or directed the murder. Accordingly, Sosa had a "knowing" and "intentional" mental state to be convicted of murder under Texas's law of the parties. *See* TEX. PEN. CODE ANN. §§ 7.01(a)–(b), 7.02(a)(2). We overrule this issue.

## C. Ineffective Assistance of Counsel

Sosa also argues that he received ineffective assistance of counsel in his trial for the murder of Aguilar. Specifically, he contends that his attorney's performance was deficient because he failed to file a motion to suppress and failed to apprise him of the

19

risks of a judge determining his sentence rather than a jury.

### 1. Applicable Law

"To obtain a reversal of a conviction under the *Strickland* test, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Davis v. State,* 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper,* 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland,* 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland,* 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland,* 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis,* 278 S.W.3d at 353.

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland,* 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v.*

*Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate . . . ."). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson,* 9 S.W.3d at 814 n.6.

### 2.  Discussion

Sosa claims that his attorney performed deficiently when he failed to file a pre-trial motion to suppress. However, a review of the clerk's record in this case reveals that Sosa's attorney filed a motion to suppress on July 21, 2011, almost two months prior to the date of trial. The motion sought to suppress "any tangible evidence seized in connection with this case without lawful warrant, probable cause, or other lawful authority," as well any statements or testimony elicited during the investigation "in violation of Defendant's [r]ights" under the U.S. or Texas Constitutions be suppressed. Because Sosa's argument is belied by the record, we overrule this sub-issue.

Sosa further contends that his trial counsel performed deficiently when counsel failed to apprise him of the risk of having a judge assess his punishment instead of jury. He argues, "A jury is more inclined to be more receptive to factors which militate against assessing a more severe sentence." In contrast, he asserts that "the trial judge, an elected official, is more inclined to make an example of the defendant." The record,

21

though, is silent regarding why Sosa's counsel elected for the judge to determine punishment. Moreover, counsel's actions were not "so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392. Accordingly, we hold that Sosa has failed to overcome the strong presumption that his counsel's decision fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland,* 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. We overrule this second sub-issue.

### III. CAUSE NUMBER 13-12-00439-CR

In this cause, Sosa was convicted of the murder of Resendez, the man who allegedly killed Aguilar. *See* TEX. PENAL CODE ANN. § 19.02. Sosa received a forty-year sentence for this conviction.

Here, Sosa asserts that there was insufficient evidence to prove that he was guilty of the murder of Resendez. Based on the record, we disagree. Marroquin testified that Resendez admitted to murdering Aguilar and was upset when Sosa failed to pay him the $20,000 promised for the murder.[8] Marroquin also testified that Sosa confessed to wanting to "get rid of" Resendez because Sosa feared that Resendez would talk about Aguilar's murder. Sosa's statement to the police, while again underplaying his involvement, essentially confirmed the facts of how Resendez was murdered and buried in Sosa's chicken coop.

Sosa points out, and we acknowledge, that Marroquin entered into a plea agreement to plead guilty to murder instead of capital murder in exchange for testifying at trial. He suggests that Marroquin, therefore, had an incentive to assist the State's

---

[8] We note that Sosa did not raise the issue of using accomplice testimony corroboration in this cause.

case against Sosa. However, the jury is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson*, 322 S.W.3d at 405; *Lancon*, 253 S.W.3d at 707. Although the jury was advised of Marroquin's plea agreement, it appears that the jury still believed Marroquin when he testified that Sosa ordered Resendez's death. We will not substitute our judgment for that of the factfinder. *Anderson*, 322 S.W.3d at 405. We overrule this issue.

## IV. CAUSE NUMBER 13-12-00155-CR

In this cause, Sosa was convicted of the offense of possession of marihuana in an amount of 2,000 pounds or less, but more than 50 pounds. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121. He received a ten year prison sentence for this conviction. He appeals this conviction by three issues: (1) the use of a drug-sniffing dog was a violation of his Fourth Amendment rights; (2) he did not receive a proper *Miranda* warning; and (3) he received ineffective assistance of counsel.

### A. Use of a Drug-Sniffing Dog

By his first issue, Sosa argues that the use of a drug-sniffing dog while officers executed the felony arrest warrant was a violation of his Fourth Amendment rights. Sosa cites the recent U.S. Supreme Court case, *Florida v. Jardines*, in support of his argument. 133 S. Ct. 1409 (2013) (holding that the use of a trained narcotics-detecting canine at a residential curtilage requires a search warrant, absent consent). However, as the State correctly points out, Sosa failed to preserve this alleged issue. Although the record shows that Sosa filed a motion to suppress the fruits of the search at his residence and not allow "any tangible evidence seized in connection with this case," the motion to suppress was later withdrawn. Further, Sosa failed to object to the admission

23

of the evidence at the time of trial.   *See* Tex. R. App. P. 33.1.   Therefore, this issue is unpreserved for our review.[9]

## B.    Failure to Issue a Proper *Miranda* Warning

By his second issue, Sosa argues that he did not receive *Miranda* warnings prior to telling Deputy Cavazos that he was aware of drugs being in his home and that there were more in the bathroom.   However, again, Sosa failed to preserve this issue by not objecting to the admission of this statement at trial.   *See* Tex. R. App. P. 33.1.   Also, we note that even though Sosa's counsel filed a "*Jackson v. Denno* Motion for Hearing on the Voluntariness of Any Admission or Confession Whether Written," there is no indication in the record that his attorney ever set this motion for hearing or received an order for it.   Furthermore, the error, if any, in the admission of Sosa's statement was minimized when the trial court gave the following instructions to the jury:

> In this case, if you find from the evidence, or if you have reasonable doubt thereof, that prior to the time the defendant gave the alleged statement or confession to Officer Robert Cavazos, if he did give it, the said Officer Robert Cavazos did not warn defendant in the respects enumerated above [which set forth the *Miranda* requirements], or as to any one of such requirements, then you will wholly disregard the alleged confession or statement and not consider it for any purpose.

For all of these reasons, we overrule this issue.

## C.    Ineffective Assistance of Counsel

In his final issue, Sosa argues that his trial counsel failed to pursue appropriate motions to suppress evidence that the State used to convict Sosa.   Sosa admits that "in trial, counsel did object to portions of the incriminating evidence against appellant";

---

[9] This Fourth Amendment argument is also problematic because there is testimonial evidence that Sosa consented to the search of his home.   *See Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010).   However, we need not delve into this analysis as the issue was not preserved for our review.

24

however, he argues that those objections "did not address the relevant issue at hand: the illegality of the evidence used against the appellant." Specifically, Sosa contends that the statements Sosa made, along with the evidence allegedly found through the use of the drug-sniffing dog, should have been excluded. First, because Sosa's counsel did object to this evidence, this argument is waived. Second, the record is silent as to why Sosa's counsel filed the motion to suppress but later withdrew it. In light of this, Sosa has failed to overcome the strong presumption that his counsel's decision fell within the wide range of reasonable professional assistance. *See Strickland,* 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

Sosa also argues that the attorney should not have allowed the trial judge to assess punishment against him and instead should have allowed the jury to do so. Again, though, the record is silent on this matter. Sosa has not met his burden on this argument, either, of showing how it constituted deficient performance or how it prejudiced the ultimate outcome of his case. *Davis*, 278 S.W.3d at 352. We overrule this issue.

## V. CONCLUSION

Having overruled all of Sosa's issues, we affirm the trial court's judgments.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
20th day of March, 2014.

25